Ammon v. Wiebold.

ALBERT AMMON

*v.*

JULIE WIEBOLD.

[Submitted April 15th, 1901.   Decided April 19th, 1901.
Filed June 4th, 1901.]

1. Complainant having, with knowledge that defendant was a lunatic, obtained an assignment of a mortgage given by her, and having filed a bill to foreclose the same, and having obtained a decree *pro confesso* without having a guardian appointed for her, and without the knowledge of her relatives, except one with whom he had colluded, the decree will be opened, and complainant be compelled to assign the mortgage to a person obtained by defendant on payment of the sum paid by complainant, with interest, complainant paying the costs.

2. Where complainant files a bill against a person known by him to be a lunatic without guardian or committee, it is his duty to make known the lunacy to the court and ask for the appointment of a guardian *ad litem*, as any proceedings in such a case taken without informing the court will be liable to be set aside or treated as a nullity as the justice of the case may require.

In foreclosure.   Petition to set aside sale of mortgaged premises and to open decree.

Ammon v. Wiebold.

*Mr. Maximilian T. Rosenberg,* for the petitioner.

*Mr. Merwyn Armstrong, Jr.,* for the complainant.

PITNEY, V. C.

The facts which clearly appear by the petition and affidavits are as follows: The defendant and petitioner, Julie Wiebold, is about seventy-three years old, and has been suffering for some time past with senile dementia, and at the time that process was served upon her in this cause was entirely incapable of understanding the nature of the business, or even recognizing her children. No inquisition in lunacy had ever been held upon her, and, of course, she had no guardian.

By the will of her husband, who died in 1895, she became the owner of a house and lot, twenty-five feet by one hundred, situate in Jersey City, subject to a mortgage for $1,000, held by a Mrs. Schaefer, which is the foundation of the suit. She had three children—daughters—a Mrs. Hansen, a Mrs. Bracken (formerly Mrs. Runge) and a Mrs. Baack, the latter of whom lived with her mother in the premises in question.

The mortgaged premises cost the husband of the defendant $3,300 in 1885, and at the time of the transaction now in question were worth at least $2,000. Mrs. Schaefer was entirely satisfied with her investment, and had no desire to change it, provided the interest was paid with reasonable promptness.

Mrs. Baack and the complainant, Ammon, were near neighbors and intimate friends. He was a butcher by trade, and lived quite near the premises in question, and was well acquainted with Mrs. Wiebold and the fact that she had lost her mind. On August 31st, 1900, at the request of Mrs. Baack, he paid $1,000 to Mrs. Schaefer and took an assignment of the mortgage from her. There was some interest in arrears. What arrangement was made about that does not appear. The petition alleges that this was done by an arrangement between complainant and Mrs. Baack, by which the mortgage was to be immediately enforced and the defendant's equity of redemption transferred to Mrs. Baack or for her benefit. The affidavits of

the complainant and Mrs. Baack on this point are peculiar. Ammon swears as follows:

"That the assignment of the indenture of mortgage referred to was entered into by deponent in order to aid *the defendant Julie Wiebold from the proceeding that was about to be taken by Emma Schaefer, the mortgagee mentioned in said petition,* and also as an investment for himself. * * * That he did not enter into any arrangement with Emma Baack concerning the assignment of the said indenture of mortgage mentioned."

And yet, as we shall see, he almost immediately commenced proceedings.

Mrs. Baack swears as follows, after stating that she lived with her mother:

"And this deponent further says that during such residence the defendant [Julie Wiebold] above named was served by a sheriff's officer or deputy with a subpœna in foreclosure proceedings at the suit of Albert Ammon assignee of Emma Schaefer [the words "Albert Ammon assignee of" are interlined], who held a mortgage on the premises above named; that at the time of such service this deponent explained fully and in detail the purpose and purport of such subpœna served as aforesaid, as said defendant is not sufficiently familiar with the English language. *That at the time of such service this deponent having the welfare of the said defendant in view, called upon one Albert Ammon, the complainant in this case, and requested him to take an assignment of the within mentioned mortgage, thereby saving to the defendant her home from the foreclosure proceedings then about to be commenced.*"

The inconsistency and untruthfulness of this statement are apparent. Besides, as we have seen, no foreclosure proceedings were threatened at all by Mrs. Schaefer.

It further appears by an affidavit produced by the complainant that he paid a third party $25 "for services rendered in making the assignment"—whatever that may mean—and to his solicitor, as a "retaining fee," $25.

On October 16th, 1900, six weeks after the assignment was taken by the complainant, he commenced his suit to foreclose. His bill is in the ordinary form, and makes no mention of the defendant's mental incapacity. He did not notify either Mrs. Hansen or Mrs. Bracken, the other daughters of the defendant, Mrs. Wiebold, though both lived in Jersey City; nor did he

take any proceedings to have a guardian *ad litem* appointed
for Mrs. Wiebold.

After the time limited for answering had expired the com-
plainant's solicitor presented the bond and mortgage and assign-
ment to a master, and obtained the ordinary report, without
reference.  Final decree was entered, execution issued, the prem-
ises advertised for sale by the sheriff of Hudson county, and
actually sold, before either Mrs. Hansen or Mrs. Bracken had
notice thereof.  The property was purchased by the complain-
ant for $500, the sale confirmed, and a deed made to him.

Mrs. Hansen then applied to the court, by. petition, reciting
that her mother, the defendant, Mrs. Wiebold, was incapable
of managing herself or her estate, and offering to become next
friend for the purpose of presenting to the court a petition on
her behalf.  Such order was made, and then Mrs. Hansen filed
her petition, with affidavits annexed; an order to show cause
why the sale should not be set aside was made; and, on the
return of that order, affidavits on behalf of the complainant,
and affidavits in reply thereto, were presented, with the result
above stated.  Upon this showing, I announced that the sale
should be opened.

After it had been decided that the sale should be opened,
the question arose whether there should be a re-sale, or whether
the defendant should have the opportunity to procure some
friend to take an assignment of the mortgage.  A *bona fide* bid
of $1,700 for the premises was made, and further satisfactory
proof was offered to the court that a person was willing to take
an assignment of the mortgage, with all arrears of interest, and
hold the same for the benefit of Mrs. Wiebold.  The matter
then stood over for a hearing and consideration of the question
upon what terms the sale should be opened, and upon what
terms the complainant should be compelled to assign the mort-
gage to an assignee, if the defendant should choose that remedy.

Hearing on this last matter, by counsel on both sides, was
had on April 15th.

. The insistment of the petitioner is that the taking of the
assignment of the mortgage by the complainant and the prompt
foreclosure thereof was the result of an arrangement between

the complainant and Mrs. Baack to divest the title from her mother and vest it in Mr. Ammon for his benefit and that of Mrs. Baack. This is technically denied by both Ammon and Mrs. Baack; but notwithstanding that denial, it seems to me quite palpable that such must have been the object. That such a proceeding was inequitable and an abuse of the machinery of the court seems to me too plain for argument.

But independent of and over and above that consideration, the counsel of petitioner takes the ground that as the complainant knew that Mrs. Wiebold was *non compos mentis,* he could not, according to the practice of the court, take a decree *pro confesso* against her, or any further proceeding, without making that fact known to the court and applying for an order appointing a guardian. And he insists, further, that it was the duty of the complainant, under the peculiar circumstances of this case, to have made known to Mrs. Wiebold's other children the fact that he held the mortgage and was proceeding to foreclose it.

I have given the proper practice in this case some study, and, in giving its result, must say that it is rather remarkable that, while our practice with regard to proceedings against infant defendants is perfectly well settled and regulated by written rules, there seems to be no written rule of the court and no published opinions of the judges as to the proper proceeding in equity against a lunatic who has never had a commission appointed for him. *Norcom* v. *Rogers, 1 C. E. Gr. 484,* and *Dorsheimer* v. *Roorback, 3 C. E. Gr. 438,* show what is necessary to enable a lunatic to sue in this court; and *Search* v. *Search, 11 C. E. Gr. 110,* deals with the case of a lunatic defendant who has a guardian, and declares that it is the duty of the complainant to make such guardian a party defendant. I find no other cases.

But it is quite clear to my mind that the practice in cases of infants and lunatic defendants must be the same. The basis of the final proceeding, in the absence of an answer, is a decree *pro confesso,* that is, that the bill be taken as confessed against the defendant. Now, in this respect, what difference is there between an infant and a lunatic? How can a bill be

declared to be taken as confessed against a lunatic any more than it can be against an infant? A lunatic cannot admit anything, and cannot confess anything. Hence, the service of process upon him is a mere formality, without any efficacy, except that it may serve to give notice to his friends that such a suit is proceeding. For this reason it seems to me that it is the duty of a complainant in this court, who knows that the defendant against whom he seeks relief is incapable, by reason of mental defect, of attending to his own business, to make that known to the court, and have a guardian appointed for him.

This seems to be the result of an examination of the English cases. They must be read in the light of what the old practice there was, namely, that complainant, in every case, was obliged to obtain from the defendant a formal appearance to his bill before he could proceed. The practice is set forth in *Mitf. Eq. Pl. *103, *104,* and notes to the American edition, and in *2 Sm. Ch. Pr. *260.* At *p. 261,* Mr. Smiths says:

"The application may be made on behalf of the person of unsound mind or on behalf of the plaintiff. On a motion by plaintiff, an order was made to appoint a guardian for the defendant to put in his answer, he being a lunatic, and the fact being verified by affidavit,"

referring to *Howlett* v. *Wilbraham, 5 Madd. 423.* And see *Shelf. Lun. 558 et seq.,* where it appears that, under the old English practice, it was usual, on the application of the complainant, to appoint one of the six clerks guardian. At *p. 560,* Mr. Shelford tells us that Lord Eldon compared the practice with respect to lunatics with that in respect to infants; said that such practice, and that of paying the expenses out of the property of such persons, could be justified only by the necessity of taking care of them, referring to *Sherwood* v. *Sanderson, 19 Ves. 283, 289.*

In the case of *Estcourt* v. *Ewington, 9 Sim. 252,* motion was made on behalf of a plaintiff in equity that a wife should answer separately upon proof that her husband was insane, and therefore incapable of answering, and the court looked into the practice and ordered one of the clerks to be appointed guardian

for the husband. Some half a dozen cases, taken from the registry by one of the clerks, are there collected.

In *Copous* v. *Kauffman, 3 Ed. Ch. 370,* Vice-Chancellor Mc-Coun, on the application of the plaintiff against an imbecile defendant, appointed a guardian. And see other cases cited in the notes to that case; and see *Barb. Ch. Pr. 84, 154,* and *1 Dan. Ch. Pr. \*176.*

Without citing further cases, the result of my investigation is that the proceedings in this case were wholly irregular. Complainant had no right to take a decree *pro confesso,* or any other decree, against the defendant without the appointment of a guardian *ad litem.*

If, in this case, the complainant had merely made an innocent mistake in practice, or had been ignorant of the mental condition of the defendant, and the pendency of the proceedings had actually been brought to the attention of the friends of the defendant in time to enable them to protect the interests of their relative, little harm would have resulted from the irregularity, for the defendant has no defence to the mortgage. But this is not the case. I am satisfied that the complainant and Mrs. Baack colluded together to take advantage of the disability of the defendant, for the purpose of procuring her equity in the premises by legal proceedings. This, as above remarked, was an inequitable and unjust use of the process of the court, and must be dealt with accordingly.

I think the ends of justice require that the complainant shall be required to assign the mortgage to the party produced by the petitioner, upon paying to him the amount of money—$1,000—which it appears he paid Mrs. Schaefer, with interest thereon from the date of payment, together with such arrears of interest due Mrs. Schaefer as he came under distinct obligation to pay Mrs. Schaefer; or the same may be paid to her, instead of to the complainant, in relief of the complainant's obligation to her. And further, I think that the complainant must pay the petitioner her costs of this proceeding. The true situation as to the arrears of interest, if any, due Mrs. Schaefer may be ascertained by further affidavits, if the parties cannot agree thereon.

The decree must be opened and sale set aside, and the com-

plaint must release the mortgaged premises to the defendant, subject to the mortgage. If any difficulty arises in carrying out the order it may be done in the presence of a master of the court.