### PYLE v. PYLE et al.

(Court of Civil Appeals of Texas. Amarillo. June 4, 1913. Rehearing Denied June 28, 1913.)

1. DEEDS (§ 211*)—JUDGMENT (§ 461*)—SUFFICIENCY OF EVIDENCE—VALIDITY—MENTAL INCAPACITY.

In an action to set aside a deed given to pay community debts and a judgment confirming the conveyance, evidence *held* sufficient to warrant the jury in finding that the grantor was insane at the time he made the conveyance and at the time the judgment was rendered, and that the grantee had knowledge of such insanity.

[Ed. Note.—For other cases, see Deeds, Cent. Dig. §§ 637–647; Dec. Dig. § 211;* Judgment, Cent. Dig. §§ 892, 893, 895; Dec. Dig. § 461.*]

2. CANCELLATION OF INSTRUMENTS (§ 51*)—JUDGMENT (§ 463*)—EQUITABLE RELIEF—INSTRUCTION—INSANITY.

In such an action an instruction which required the jury to find that the grantor was insane at the time he executed the deed, that the grantee knew of such insanity, and fraudulently procured the conveyance by undue influence for less than the property was worth, and that the grantor was still insane at the time the judgment was rendered, before they could find for the plaintiffs, was as favorable to the defendant as he could ask.

[Ed. Note.—For other cases, see Cancellation of Instruments, Cent. Dig. § 108; Dec. Dig. § 51;* Judgment, Cent. Dig. § 896; Dec. Dig. § 463.*]

3. INSANE PERSONS (§ 100*) — JUDGMENT AGAINST—VALIDITY.

A judgment against an insane person is voidable only, not void.

[Ed. Note.—For other cases, see Insane Persons, Cent. Dig. §§ 179–184; Dec. Dig. § 100.*]

4. INSANE PERSONS (§ 100*)—NEW TRIAL (§ 15*)—VACATING—INSANE DEFENDANT.

Where a judgment has been rendered against an insane person by a court which is ignorant of his insanity, which judgment confirms a voidable conveyance by the lunatic, the judgment may be set aside by an action brought for that purpose, or by an application for a new trial, upon an offer to restore the consideration, or a proper showing of facts which avoid the necessity of restoration.

[Ed. Note.—For other cases, see Insane Persons, Cent. Dig. §§ 179–184; Dec. Dig. § 100;* New Trial, Cent. Dig. § 21; Dec. Dig. § 15.*]

5. INSANE PERSONS (§ 66*)—CONVEYANCES—REMEDIES.

Where a grantee, who had fraudulently secured a conveyance of land from his brother, knowing that he was insane, and had thereafter brought suit to confirm the deed and secured a judgment, had conveyed the property to an innocent purchaser before the action to set aside the deed and judgment was instituted, the guardian of the insane person may recover damages against the grantee.

[Ed. Note.—For other cases, see Insane Persons, Cent. Dig. §§ 100–102, 104, 105; Dec. Dig. § 66.*]

6. INSANE PERSONS (§ 66*)—CONVEYANCES—REMEDIES—MEASURE OF DAMAGES.

In such an action, the measure of damages is the difference between the amount paid by the grantee and the actual value of the land, not the price for which the grantee sold it.

[Ed. Note.—For other cases, see Insane Persons, Cent. Dig. §§ 100–102, 104, 105; Dec. Dig. § 66.*]

7. HUSBAND AND WIFE (§ 274*)—COMMUNITY PROPERTY—RIGHTS OF HEIRS—ACTIONS.

Where a surviving husband was insane at the time he conveyed community property for the ostensible payment of community debts, and a judgment confirming the conveyance had been obtained against him and the minor children, in an action in which both the court and guardian ad litem were ignorant of the grantor's insanity, the judgment is not binding upon the children, but may be set aside by their permanent guardian.

[Ed. Note.—For other cases, see Husband and Wife, Cent. Dig. §§ 1026–1031; Dec. Dig. § 274.*]

8. HUSBAND AND WIFE (§ 273*)—RIGHTS OF SURVIVOR — CONVEYANCE TO PAY COMMUNITY DEBTS.

A surviving husband can convey community property to pay community debts, even without administration, if he is sane and the transaction is free from fraud.

[Ed. Note.—For other cases, see Husband and Wife, Cent. Dig. §§ 1008–1024; Dec. Dig. § 273.*]

9. HUSBAND AND WIFE (§ 274*) — RIGHT OF HEIRS—ACTIONS.

In an action to set aside a judgment confirming, as against minor children, a conveyance by their father of the community property after their mother's death, which conveyance was made while he was insane, ostensibly for the payment of community debts, the fact that the guardian ad litem of the children in the former proceeding testified at the later trial that he then thought that the father was sane at the time the former judgment was rendered does not affect the right of the children to have the deed set aside.

[Ed. Note.—For other cases, see Husband and Wife, Cent. Dig. §§ 1026–1031; Dec. Dig. § 274.*]

10. TRIAL (§ 260*)—REQUESTED INSTRUCTIONS—INSTRUCTION ALREADY GIVEN.

A requested charge which is already covered in the court's main charge is properly refused.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 651–659; Dec. Dig. § 260.*]

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

Appeal from District Court, Wilbarger County; S. P. Huff, Judge.

Suit by T. J. Pyle and others against J. G. Pyle. Judgment for the plaintiffs, and defendant appeals. Affirmed.

Read & Lowrance, of Dallas, and L. P. Bonner, of Vernon, for appellant. Mathis & Kay, of Wichita Falls, and Storey & Warlick, of Vernon, for appellees.

HENDRICKS, J. This suit was instituted in the district court of Wilbarger county, Tex., on January 24, 1912, by T. J. Pyle, Mrs. Anabel Swink, joined by her husband, J. W. Swink, Mrs. E. C. Pyle, William S. Pyle, Elizabeth Lou Pyle, and Richard Maxwell Pyle, minors, by their next friend, T. J. Pyle, and R. M. Pyle, by his next friend, T. J. Pyle, against J. G. Pyle.

On the 11th day of July, 1907, R. M. Pyle, who on account of his insanity is represented here by his next friend, T. J. Pyle, and his children by former wife, who are the other plaintiffs in this cause, were the owners of section No. 24, block 13, H. & T. C. Ry. Co. survey—the children and their father each owning an undivided one-half interest—and upon the said date the said R. M. Pyle executed and delivered to his brother, the defendant J. G. Pyle herein, a deed to said section of land, which is attempted to be sustained in this suit on the basis of the existence of community debts, and the conveyance of the land for the purpose of paying the same; and thereafter in 1908 J. G. Pyle brought suit in the district court of Wilbarger county, Tex., against R. M. Pyle, in trespass to try title, also making his children by the former wife parties defendant in said cause, the minors being represented in said action by a guardian ad litem; and upon the 19th day of September of that year a judgment was entered against R. M. Pyle and his said children as the result of said suit, for the purpose of divesting the title into J. G. Pyle, based upon the proposition, as apparent from the record in this cause, that the deed executed by R. M. Pyle on the 11th day of July, 1907, was a conveyance of community property for the purpose of paying community obligations; and this present action, while containing allegations of a direct attack, principally predicated upon the insanity of R. M. Pyle and the fraudulent procurement of said deed from him by J. G. Pyle, and the covinous procurement of the judgment in trespass to try title, was, however, in reality resolved into an action for damages against the said J. G. Pyle, it having been admitted and agreed that said J. G. Pyle sold said section 24 to innocent parties, the cause having been tried by the court and the parties thereto upon said admission and the theory indicated.

[1] A solution of this cause of action is principally determined by the proposition whether or not the testimony sufficiently suggests the insanity of R. M. Pyle, for the purpose of submitting that issue to the jury. R. M. Pyle, who executed said deed, now in the state asylum, after an inquisition of insanity, was a farmer, owning the particular section of land in controversy and other land constituting his homestead, and some live stock, and to a certain period the record indicates had been an ordinarily successful husbandman, and the particular section of land is principally all prairie land and subject to cultivation, except about 50 acres, and which constituted a part of the community property of himself and his first wife, who died in 1905.

A. Richie, a man 60 years of age, and who had lived in Wilbarger county for 21 years, and who had been a neighbor of R. M. Pyle for several years, testified that the first time he noticed anything wrong with Mr. Pyle was when one of his boys was killed—breaking his neck while ploughing—several years before his first wife's death, saying that he "got rattled over this and kept getting worse, and after his wife died he was rattled from that time on," and that the actions of Pyle at the grave of his first wife in 1905 attracted his attention, "making a rattling crazy talk, * * *" and that he announced "that he (Pyle) thought it was a kind of a judgment sent on him for the kind of life he had lived; he was not at himself at all," and that "after his wife died Pyle lost interest in his farm and lost two crops, and did not pay for the thrashing or anything else, and went off and married and did not have money enough to get back on, * * * and whenever I was with him he seemed to want to get rid of everything he had and live a consecrated life. He said what he had seemed to be tainted. * * * He was liberal at one time, and then again he was stingy; and then he would take a notion that if he owed anything and did not pay it before the sun went down he did not owe it." And Pyle said that a certain man who owed him money "wanted to pay him (the debt), but he would not let him because he let the sun go down, and that that fellow did not owe him a cent." This witness also testified as to the conversion of Pyle, in 1906, to the principles of a "Holiness" religious sect, who were required by the community to leave that section of the country after quite a protracted meeting, and that Pyle said that he had professed and had got the second blessing—claimed that he was a Divine Healer—"said he could heal any sick man, and he went wild on that. He went wild on hypnotism. He said there was nothing in this thing of giving children medicine, and the next time I saw him he had a cure-all, and it was stagnant water. * * * He said that he was going to have a home for fallen women, and was going to own the land around there, * * * and that he was going to give up everything he had." When this witness asked Pyle in regard to

the protection of his family, he said the Lord would take care of them; and further stated "that he was going to be good to Mrs. Richie and I, and that he was going to give us a place." Pyle had invented a weed killer, which was a grate, constructed to burn coal and to be dragged over the weeds, although this witness said he "never talked to Mr. Pyle much about his weed destroyer—he would get too wild about that." We infer from this testimony that the observations of this witness were to a great many of the peculiar manifestations of Pyle before the execution of the deed by Pyle to his brother of section 24, in July, 1907.

T. J. Pyle, now 23 years of age, and having been 15 or 16 years of age at the time of his mother's death, testified to the peculiar actions of his father at the grave of his mother—preaching a short sermon to the people as to the life he had lived, attributing the death of his wife to that fact—and, according to the second wife's testimony, within a period of three months was engaged to be married to her, whom he had not seen for over 25 years, and whom he married within 4½ months of his first wife's death. T. J. Pyle said that his attention was first called to the condition of his father's mind when he left a $3,000 wheat crop to rot for the purpose of going to Tennessee and marrying, this witness being the oldest boy at home at that time, and further said that after the death of his mother his father began to rent out his property, and get rid of it, paying special attention to religion, and, as this witness expressed it, "some Holiness came to Harrold and held a meeting, and it was not until a few days that they had father going it, and he never paid any attention to anything but the Bible from that time on"—stating that these people were there about three weeks, and that his father "would get up and preach and get out in town and talk and profess to be sanctified; and so at this time he began fasting, so that I might be saved, and he fasted three or four days, and I told him I was all right, and he went to eating again, and then went to church and told them what he had done. * * *" He also had a horse which he decided to make fast in order to get the devil out of him and for that purpose kept him up for several days; this witness stating that his father "got worse in 1907 than he was in 1906," after he joined the new sect, and that he did not undertake to take care of his property after he professed sanctification. "* * * He said (meaning his father) he was going to get up a band of men of drunkards and gamblers and start a kind of Holiness band, * * * travel in a special car," abandoning that method of locomotion and substituting therefor a string of automobiles, with an attachment of big hooks on the wheels, for the purpose of going to Africa—decided that the negroes were the best tribe, and that they were the only ones that were going to be saved, discussing this matter for about a year—"the clouds," said this witness, "would come up and he would see things he was going to do in Africa, and said that it would not do for us to own anything, * * * and that he was going to buy 13 square miles of land around Harrold." * * * My father invented a weed killer in 1906, and claimed that he was going to get a patent * * * and sell it for a million dollars. It was just a grate with a fire in it * * * and after he invented this he built a fire in it and drug it about as far as across this room, and he finally forgot it." He claimed he had a negro at Ft. Worth that he was going to hypnotize, and after having placed him in that condition, he would compel him to look through the earth and find gold mines and oil.

His second wife testified to some of the matters mentioned above, and further said that her husband came to her in 1907, stating that he was in trouble and wanted to sell this particular section of land and had not the mind to do it, and that he could not attend to business under the circumstances and do what he ought for the Lord, and also stated "that he had no business with this land, and that as soon as he could get rid of it he could do what God wanted him to do; * * * that he did not want his children to have anything"; and after he converted his property into money he claimed that he was going out as an evangelist, expressing some anxiety as to what he would do with her during this period, and that on this evangelical tour he would take the Holiness people with him, and would also be accompanied by 10 souls and a yellow dog. She further testified that from the time of the meeting at Harrold her husband "took the least care of things—the least of any man I ever saw." During one of the prior conservations with reference to disposing of his property, to obtain a surplus for religious purposes, he stated he wanted to put his property in the hands of his brothers who would dispose of the land and pay off the debts, which seemed to be greatly on his mind.

The witness W. G. Chesner, who knew Pyle in Fannin county 30 years before, and rented some land from him in December, 1907, and who had not seen Pyle for 12 years, stated that he "noticed there was something wrong with Pyle, after I had been there a few days." Spoke of Pyle and another neighbor having a quarrel over the rake, the neighbor striking Pyle with the rake, who began to laugh and turned the other cheek and told him to hit again. This witness further stated that he "saw J. G. Pyle in 1908, who seemed to recognize that Dick (R. M. Pyle) was off, and said that he thought I could manage Dick and get along with him," and that J. G. Pyle informed this witness that R. M. Pyle had written him a letter in regard to his financial trouble, testifying

that he (J. G. Pyle) "seemed to think that his brother went off with the sanctified people and was not taking care of things * * * and that he thought he could trade the place better than R. M. Pyle."

Another witness testified that in April or May, 1907, he offered R. M. Pyle $12.50 per acre for section 24, in controversy, and wanted to purchase the land as an investment, offering two-thirds cash and the balance on time, which was refused; the testimony showing that R. M. Pyle conveyed the property to his brother in July, 1907, for $10 per acre, about $2,000 of which is represented by old debts claimed by J. G. Pyle to have been owing by R. M. Pyle, although barred by the statute of limitations, $1,000 of which amount J. G. Pyle claimed, with the accumulated interest, represented an amount due for the sale of a jack made to his brother several years before the conveyance of this land; W. S. Pyle, the oldest son of R. M. Pyle, testifying, however, that said jack was kept by his father for his uncle on the shares until the animal died, and that he never heard of any sale to his father or any claim of ownership by the latter to the animal, and that his father was a "man that related his affairs," J. G. Pyle stating that the sale was for the principal sum of $500, the other $500 of this $1,000 representing the accumulated interest.

It is apparent from the testimony of the wife of R. M. Pyle, and of the witness Felty, a neighbor, that the defendant J. G. Pyle, at the time of the execution of the deed in 1907, and the institution of the suit by him in 1908, was cognizant of the mental condition of his brother.

Excluding the debts barred by the statute of limitation (which the jury probably found did not exist) the real consideration of the conveyance from R. M. Pyle to his brother was the sum of $4,200; and the verdict of the jury, when you consider the amount found in favor of J. G. Pyle, against the two children, barred by limitation, indicates that the value of the 640 acres of land upon the date the deed was executed was $10,744, and we so find. We conclude that at the time the deed was made, and at the date the judgment was rendered, the mental impairment of R. M. Pyle was such, as to the management of his affairs, and as to an understanding of the consequences of his acts, he was an insane person in law, and that the evidence was sufficient to raise the issue. We believe that the symptoms mentioned, and the delusions manifested by R. M. Pyle, indicate a weakened intellect at such time, and that while it is true a man may be an extremist on religion and sane upon business matters, there is sufficient evidence justifying the verdict of the jury that the loss of reason affected his understanding of matters of his own welfare. Clevenger, in his work on Medical Jurisprudence of Insanity, vol. 1, p. 50, quoting Spitska, classifies and separates the delusions of the insane into systematized and unsystematized, and claims that the classification is an important one. He says: "The systematized delusion, one that is logically arranged, explained, and defended, occurs in but two forms of insanity; paranoia and hysterical insanity. Reasons can be given by such deluded patients for all their affirmances relating to the delusion. Unsystematized is the common delusion of other insane. * * * Both the systematized and unsystematized delusions may be held by an insane person for a longer or shorter period. * * * Unsystematized notions of the insane may be fixed or exist for quite a while, *as when a maniac harps for a week or so upon one subject.* This fixation for the time does not constitute the delusion a systematized one, for no attempt to explain why this one subject is uppermost is made by the insane mind, and therefore this fixed delusion is unsystematized." As we understand the authorities on insanity, there may be insanity upon a subject accompanied with the power of reasoning to justify the delusion, which is not an interference in law with the acts of such a person in other matters as to constitute him mentally incompetent until the derangement pervades the intellect more completely, and affects his consciousness in other directions. This record does not indicate any process of reasoning on the part of this subject, justifying his insane delusions, but are variable in matters of religion, with some ideas of social reform, and which the evidence indicates, to some extent, with reference to a conception of his business matters and the preservation of his property, as well as the welfare of himself and family, his reason to some extent has been affected. From the condition of the testimony, the jury could have decided either way. Some of his business acts—a great many of them—indicate that as to such matters he was not insane, and his management of the suit for his brother, against himself and children, for the purpose of validating the deed he had previously given is compatible with intelligence to the point of shrewdness, but not incompatible with insanity, nor with the broader proposition as to his lack of conception of the consequences of his acts—the insane may pursue a systematized course of conduct which may have all the earmarks of sanity in a sense, but, when considered as a whole with reference to his condition, is also the act of an unbalanced mind.

[2] First. We regard the assignment of error, challenging the action of the trial court, in submitting the following charge to the jury, as the most important and controlling question in this record: "If you shall find from a preponderance of the evidence that on July 11, 1907, R. M. Pyle made and delivered to J. G. Pyle, the defendant, a deed to section No. 24, block 13, H. & T. C. Ry. Co.

survey, in Wilbarger county, Tex., and at the time of doing so R. M. Pyle was insane and then incapable of comprehending or understanding the nature of such transaction; and if you find the defendant, J. G. Pyle, then knew R. M. Pyle's mental condition, or was in possession of facts which, if pursued with reasonable diligence, would have led to such knowledge; and if you find that the consideration for said conveyance was to pay community debts owing by the community estate of R. M. Pyle and his deceased wife, D. Z. Pyle; and if you further find that the defendant, J. G. Pyle, through his influence over his brother, R. M. Pyle, while in that condition, if he in fact was insane, fraudulently induced him to make such conveyance; and if you find that the land was in value greatly in excess of the consideration paid thereon; and if you find, taking into consideration the condition of R. M. Pyle and the price paid for the land, that the same was unfair; and if you further find that in order to further secure such conveyance the defendant, J. G. Pyle, instituted suit in this court against R. M. Pyle and his children, the plaintiffs in this case; and if you find that at the time the judgment was rendered the said R. M. Pyle was insane—if you so find, your verdict should be for the plaintiffs herein." An analysis of this charge required the jury to find the insanity of R. M. Pyle at the time of the execution of the deed, his brother's knowledge of his insanity, and the fraudulent procurement by him of said deed on account of the latter's influence over the former—a disproportion between the value of the land and the consideration paid—and to further find that J. G. Pyle, for the purpose of securing such a conveyance, instituted the suit producing the judgment in question, and that at the time of the rendition of the same R. M. Pyle was insane.

[3, 4] We believe this charge is as favorable to the appellant as he could expect under the law. If the appellees had instituted an action of direct attack upon the judgment, the fact of insanity at that date and the date of the deed would have been sufficient, we believe, to have justified an annullment of the judgment, at least by R. M. Pyle. Of course a judgment against an insane person is not void—it is only voidable—but it is settled that where a judgment has been rendered in the ignorance of some fact which would render the judgment void or voidable, the error at common law could be corrected by the writ of error coram nobis, superseded and not now in use in this state. And the Supreme Court of this state announced this doctrine to the extent of granting the power to a Court of Civil Appeals, where it had rendered a judgment against a married woman upon a supersedeas bond in ignorance of her coverture, exhibited to that court upon motion, accompanied by supporting affidavit (Cruger v. McCracken, 87 Tex. 586, 30 S. W.

538), and in this case, in discussing judgments of this character and the remedy applicable thereto for the purpose of reviewing the same, the Supreme Court said: "This may take place by reason of the coverture, infancy, or death of one of the parties, when the fact is not shown by the record at the time the judgment is rendered"—holding that the Court of Civil Appeals in that instance should have acted upon the motion presented for the purpose of vacating the judgment, and, if satisfied of the existence of the coverture, should have annulled the judgment. In the case of Wallis, Landes & Co. v. Stuart, 92 Tex. 571, 50 S. W. 567, there was a review of a cause in which a judgment had been rendered against a minor for the value of certain merchandise, and the plaintiff in that suit knew that the defendant was a minor, and had brought the suit against the minor as a person sui juris, without taking any notice of his minority, or having a guardian ad litem appointed to represent him in the cause. This judgment, was not appealed from, but the minor sued directly in the same court to set aside the judgment, alleging his minority when the judgment was rendered; that the merchandise sold to him was not necessaries, and at the time of the judgment he neither had the goods nor the proceeds of same, which allegations were sustained by the evidence; no issue of fraud in the procurement of the judgment was raised by the pleadings or submitted to the jury, and the question was certified to the Supreme Court whether the minor's petition was "sufficient to entitle the appellee to have the judgment set aside upon the bare allegations, for cause, that he was a minor when the judgment was rendered, and that the merchandise was not for necessaries, without alleging fraud in the procurement of the judgment or some equitable reason therefor." Justice Brown said that such a judgment against a minor was erroneous, and may be set aside in a proceeding brought directly for that purpose, and, answering the question certified, further said: "In this case, as we understand from the statement accompanying the questions, the defendant in the judgment brought in the court in which it was rendered a suit to set it aside, alleged that he was a minor, that he was sued as an adult, and that he was not defended by a guardian, and also facts which showed a lawful defense to the action. We think the proceeding was competent, and that upon proof of his allegations he was entitled to have the judgment vacated and a new trial awarded." The case of Ammon v. Wiebold, 61 N. J. Eq. 351, 48 Atl. 950, decided by Vice Chancellor Pitney (now on the Supreme Court of the United States) is instructive upon the question, and in the course of this opinion he says: "It is quite clear to my mind that the practice in cases of infants and lunatic defendants must be the same." In that cause it was a decree

pro confesso against a lunatic defendant without an answer, and this chancellor further said: "In this respect, what difference is there between an infant and a lunatic? How can a bill be declared to be taken as confessed against a lunatic any more than it can be against an infant? A lunatic cannot confess anything and cannot admit anything. * * * For this reason it seems to me that it is the duty of a complainant in this court, who knows that the defendant against whom he seeks relief is incapable, by reason of mental defect, of attending to his own business, to make that known to the court, and have a guardian appointed for him. This seems to be the result of an examination of the English cases. * * * Mr. Shelton tells us that Lord Eldon compared the practice with regard to infants with that in respect to lunatics." This was a cause where a party, knowing that another was an incompetent, had purchased a mortgage against some property which had descended to the lunatic, obtained a decree pro confesso; and this chancellor further said: "If in this case the complainant had merely made an innocent mistake in practice, or had been ignorant of the mental condition of the defendant, and the pendency of the proceedings had actually been brought to the attention of the friends of the defendant in time to enable them to protect the interests of their relative, little harm would have resulted from the irregularity, for the defendant had no defense to the mortgage. But this is not the case. I am satisfied that the complainant and Mrs. Baack colluded together to take advantage of the disability of the defendant, for the purpose of procuring her equity in the premises by legal proceedings. This, as above remarked, was an inequitable and unjust use of the process of the court, and must be dealt with accordingly." Mrs. Baack was a relative of the lunatic, who acted in conspiracy with the plaintiff in the former suit, and the court vacated the judgment, set the sale of the property aside (the fraudulent litigant having purchased the property at his own sale), compelling an assignment of the mortgage to a person procured by the guardian of the incompetent. There is a condition of parallelism running through the law as to the similarity of legal status between that of an infant and a lunatic, not only with reference to procedure, but as to their property rights; the legal effects of their actions, with reference to their property, in dealing with others, and the penalty resultant to others in dealing with them, in certain cases may work an individual hardship, but with regard to which, in preserving the symmetry of the law, and the policy of the same with reference to their protection, the courts have extended the rules in their favor inappropriate for us to even criticize or attempt to reverse; and from the logic of these cases and the principles announced, we think this cause should be maintained.

If R. M. Pyle was sane at the time he conveyed the land to his brother, and he owed community debts and sold the land for that purpose, and the transaction was free from fraud, of course he conveyed the title of the land to his brother. If R. M. Pyle was insane at that time whether J. G. Pyle knew it or not, the deed itself could have been avoided by a restitution of the consideration, if not spent or squandered. If insane at the time the judgment was rendered validating the deed, and insane at the time the deed was executed, by analogy from the case of Wallis, Landes & Co. v. Stuart, supra, the judgment could have been set aside upon direct attack, and new trial awarded, especially upon allegations exhibiting a proper avoidance of the necessity of restitution, at least by R. M. Pyle. On account of the judgment being voidable and not void, the authorities outside of this state seem to be unanimous that an innocent purchaser at a sale, if it had been a judgment ordering the sale of the lunatic's property, would have been protected by such judgment and sale, and the same protection might be afforded a similar purchaser of the property from J. G. Pyle; the judgment being a link in the chain of title. Crawford v. Thomson, 161 Ill. 161, 43 N. E. 617; Dunn v. Dunn, 114 Cal. 210, 46 Pac. 5; Rau v. Katz, 26 La. Ann. 463; Heard v. Sack, 81 Mo. 610.

[5] But with this question we are not concerned, as there is an admission in this cause that the purchaser of this property from J. G. Pyle was an innocent purchaser, and the case was tried upon that theory. The testimony in this cause clearly raises and suggests the knowledge of the defendant, J. G. Pyle, of the insanity of his brother at the time he procured the deed and the judgment; the jury resolved it. The evidence also clearly raises the question of a partial fictitious consideration entering into the conveyance—an evidence of fraud—and which R. M. Pyle, the insane defendant, testified to in the other cause. Clearly, under all the facts, the guardian or next friend of R. M. Pyle would have had the right to have vacated this judgment against J. G. Pyle by direct attack upon proffer of proper equity, and have the land restored, if in the possession of J. G. Pyle; and, if admitted that the land has been sold to an innocent purchaser, upon the proper alternative allegations for damages, would the guardian of the lunatic and the other co-owners, the children, have the right to maintain the suit for damages? We admit we are unable to find an authority directly in point upon the former question; and, in so far as we are able to ascertain, the second proposition, or any similar question, is undecided. As to the first question, it is certain that if a prospective purchaser fraudulently induces the owner of land to convey the same to him, and he in turn sells the land to another, the owner defrauded is entitled to damages for

the fraud. In the case of Mountain v. Day, 91 Minn. 252, 97 N. W. 884, where the vendee had fraudulently procured a deed from the owner, the Supreme Court of Minnesota said there is no difference between that of a fraud by the vendee who buys the land than of a vendor who sells it—"the party making misrepresentations cannot escape their legal effect, even though he be a prospective purchaser." Judge Clark of the Supreme Court of North Carolina, in the case of Odom v. Riddick, 104 N. C. 515, 10 S. E. 609, 7 L. R. A. 119, 17 Am. St. Rep. 686, in discussing the contracts of the insane, said that, "such persons, being incapable in point of capacity to enter into any valid contract, or to do any valid act, every person dealing with them knowing their incapacity is deemed to perpetrate a meditated fraud upon them and their rights," quoting Story, Eq. Jur. § 227, and citing Adams, Eq., 183, to the same effect. The case of Sprinkle v. Wellborn, by the Supreme Court of North Carolina, 140 N. C. 163, 52 S. E. 666, 3 L. R. A. (N. S.) 180, 111 Am. St. Rep. 827, cited by appellant upon the measure of damages, quotes Lord Hardwicke, to the same effect. This latter case held the action of damages was appropriate against the party who had procured a deed from an insane person, with knowledge of his insanity and had resold the property to another. Of course there may be cases where there is fraud without damages, and although we are unable to find a case in point upon the proposition where the fraudulent deed from an insane person is merged into a fraudulent judgment, and the property then resold (in this case admitted to have been to an innocent purchaser), still a remediless suitor is a rarity in law; and, all the analogies of the law supporting it, we hold the action will lie.

[6] In connection with the discussion of the nature of the action, the matter of the measure of damages is pertinent; appellant contending that the trial court in this instance improperly charged the jury in this respect, which was a submission of a difference in the value of the property at the date it was fraudulently procured by deed and the amounts paid by J. G. Pyle and assumed at that date, with a difference of interest figured to the time of verdict upon both amounts, which we believe to be correct. It is true the case of Sprinkle v. Wellborn (N. C.), cited by appellant, supra, is suggestive of a different measure, but to us is irrational when you sound the doctrine of compensation, which should be the resultant injury to appellees as the procured effect of an efficient fraud. The true measure of damages—unless it is arbitrarily settled by some standard rule—should always equal the loss inflicted upon the injured party. If A. fraudulently procures 100 head of horses from B. at $50 per head when they are worth $100, B.'s loss is $50 per head. We are not concerned with a difference between a represented value and an actual value in this instance; and hence if A. procures a conveyance of land from B. by fraud for $1,000, the contract price, and conveys it to C., and it is worth $2,000, B. has lost $1,000. Justice Fly of the Fourth district, in the case of Ellis v. Barlow, 26 S. W. 908, held "that one who by false representations procured an assignment of a judgment to him under its face value, the measure was the difference between the face value (which was its actual value) and the amount paid. The Supreme Court of this state held, in the case of Greenwood v. Pierce, 58 Tex. 133, that where a purchaser was misled to receive a deed to property upon fraudulent assurances as to the future location of a railroad, the measure of damages is the difference between the contract price and the actual value of the property, which seems to be the universal rule in all jurisdictions where there is not a represented value. The Supreme Court of the United States, in the case of Sigafus v. Porter, 179 U. S. 116, 21 Sup. Ct. 34, 45 L. Ed. 116, held the same rule, sustaining a verdict for over $300,000, where the vendor perpetrated the fraud upon the vendee. The appellant in this cause is contending for the North Carolina rule that the measure should have been the difference between the amount J. G. Pyle received for the land when he sold it to the innocent purchaser and the amount paid by him to this brother. It is to be noted that appellant in his assignment of error merely complains that the court submitted an improper measure, with the propositions subjoined that the difference he designates is the proper measure, without indicating any injury. Appellant is shown to have traded section 24 for other land, paying a difference himself in money, and such a rule, to work it out, would be complicated in this instance. As the rule of damages is one of compensation, and not of arbitrary standard in this instance, we believe no injury is shown. The Supreme Court of Minnesota, in the case of Mountain v. Day, supra, where a vendee was acquainted with the property and the vendor was not, and the vendee fraudulently procured a deed to the same, from the vendor, the court announcing the true rule of damages as the difference in the contract price and the actual value of the land, where the trial court applied a different rule, further said: "In any event, the court's attention should have been called to the fact that the rule was not accurately stated, if considered prejudicial." 91 Minn. 253, 97 N. W. 885. Of course there is no contract price as the insane appellee, R. M. Pyle, could not make a contract, but the criterion of loss should be the same; that is, the amount paid under a purported contract with an insane man, and the actual cash value of the property, at least we hold it under appellant's assignments.

[7] Second. With reference to the question of the binding force of the judgment upon the children, raised by appellant's thirteenth as-

signment of error, on account of the trial court having overruled a special exception, addressed to the petition, raising the question, we think the petition was sufficient as against the exception, but we prefer to go deeper into the question.

[8] Of course the power exists in the survivor, unaccompanied with fraud, to convey the community property to pay community debts, even without administration, and divest the title of the children, but an insane parent could not do it; and for a stronger reason, insanity, coupled with fraud and knowledge of the purchaser of conditions, it could not be done. The power of the parent is derived from conditions, and when the court rendered the judgment in this cause, attempting to validate the deed, it was presumably based upon proof of the conditions, which was also proof of the power, in order to vitalize the deed. One essential fact, however, was unknown to the court in that proceeding, as shown by this proceeding, the insanity of R. M. Pyle, and upon whose sanity the existence of the power depended when he executed the deed; and upon whose sanity the validity of the judgment depended when the court attempted to merge the deed into the judgment. We have seen from the two cases by the Supreme Court of this state (Wallis, Landes & Co. v. Stuart, and Cruger v. McCracken, supra) "when a fact of this character is not shown by the record to the court at the time the judgment was rendered, such judgment is erroneous, and may be set aside by a proceeding brought directly for that purpose"—and fraud would of course add strength to the proceeding. The guardian ad litem, appointed to represent the children was ignorant, as well as the court, of the insanity of R. M. Pyle; and the temporary guardian in law of the minors representing their interests, in entire substitution of the ability and power of the children to represent themselves, without this knowledge, could not defend against it.

[9] The belief of the guardian now, based upon his observation of the acts of R. M. Pyle when the judgment was rendered, that he was then sane, does not impair the argument, or devitalize the principle, asserted. The permanent guardian of these children, upon proof of the conditions in this case, could set aside this judgment; and, the property having been conveyed to an innocent purchaser, we hold the minor children have the same alternative action for damages, which the guardian of the lunatic has in this case.

[10] Third. The refusal of the appellant's special charge, complained of by his seventh assignment of error, was proper; the trial judge sufficiently covered the matter in his main charge. The contention for an instructed verdict, and the question of the insufficiency of the evidence to sustain the judgment, are sufficiently disposed of by our discussion of the evidence. We have carefully reviewed the assignments, and it would be unprofitable to discuss the remainder, and they are overruled.

The judgment is affirmed.

HUFF, C. J., not sitting.