HEINE, Guardian, and another, Appellants, vs. WITT, Respondent.

*June 11—July 1, 1947.*

E. J. *Mueller* of Milwaukee, guardian *ad litem*, for the appellants.

For the respondent there was a brief by *Runkel & Runkel* of Port Washington, and oral argument by *Paul D. Runkel*.

FOWLER, J.    The case is before the court upon appeal from an order of the county court of Ozaukee county denying a motion to vacate a judgment of divorce granted by that court on April 20, 1939.    The motion was made by "the guardian of the estate of Irene Witt, a mentally incompetent person," appointed by the county court of Milwaukee county, pursuant

to authorization thereto granted by order of said county court. The ward was the plaintiff in the action wherein the divorce was granted. The defendant appeared in said action by attorney, but interposed no answer. The judgment of divorce was granted on a finding by the court that the defendant "on several occasions physically struck and assaulted the plaintiff" and had "nagged and criticized plaintiff and exercised a mean and quarrelsome nature and disposition toward her," and pursuant to a stipulation signed by both parties and their attorneys that if a divorce should be granted by the court the judgment should divide the property between the parties as stipulated, and adjudge a payment of $10 a week by the defendant to the plaintiff as alimony. The evidence on which the court's findings were made is not incorporated in the bill of exceptions for the stated reason that the reporter who took the evidence was dead at the time the proceeding to vacate the judgment was commenced and his successor was unable to transcribe his stenographic notes. It appears that the only testimony presented was given by the plaintiff and a witness who testified only to her residence.

The ground of the motion to vacate the judgment is that the plaintiff was insane at the time the divorce action was started and the judgment granted and known to be so by the defendant. The trial judge in a written decision filed correctly enough stated that the issues before him to decide were "Was the plaintiff insane on the day the divorce was granted?" and if so, "Did the defendant, through undue influence or fraud, induce the plaintiff to bring, and go through with, the divorce?" We shall consider whether the affirmative of these issues was established by the movant with the well-established rules in mind that the ruling of the trial judge must be sustained unless it is against the great weight and clear preponderance of the evidence, and that fraud can only be found upon clear and satisfactory evidence that convinces to a reasonable certainty.

The parties were married in 1930 and both resided in Milwaukee from that time until after the divorce was granted. Instead of bringing the action in Milwaukee county it was brought, for some purpose not appearing, in the county of Ozaukee. The issues were decided by the court "upon the record" and oral evidence produced upon hearing of the motion. The following circumstances appear from admissions of the defendant or from undisputed evidence. When the plaintiff first saw the attorney who appeared for her in connection with the action the defendant drove her in his automobile to the attorney's office and introduced the plaintiff to him. The plaintiff had never before met the attorney. On being informed that the plaintiff desired to commence an action for divorce the attorney excluded the defendant from the room and talked with plaintiff alone. The defendant testified that plaintiff had asked him if he "knew an attorney who would handle the divorce for her" and he said he did. Defendant also testified in immediate connection that he did not tell her "to go anywhere or that the attorney he had in mind would handle the divorce case." The attorney had represented the defendant at one time in a "little business matter." and had been his father's attorney before. Defendant was in partnership with his brothers and this attorney had taken care of defendant's business matters in connection with the partnership. Defendant retained an attorney to represent him in the case who at the time occupied offices with the attorney representing the wife and both attorneys used the same telephone. By admission of the defendant it appears that the defendant had before this "brought" his wife to the office of the attorney for movant "because she wanted to get a divorce." He also testified in immediate connection that his wife suggested that he bring her to the office of movant's attorney "because she knew he was a friend," and that this attorney said he would not take the case, stating as reason that being a friend he "might be prejudiced one way or another." It also appears

from defendant's testimony that he afterwards received a bill from movant's attorney for services rendered upon this occasion and that when he received it he called up the wife's attorney about it, and the attorney said he would "handle it" and defendant "gave it to him to handle" and "paid him for handling it." The wife's attorney testified as to this that an action was brought in civil court of Milwaukee county to recover for the services covered by this bill, and that on March 19, 1940, the attorney for movant signed a receipt for $5.85 in full payment for these services and reciting that the suit was "withdrawn," and the defendant paid the amount. The attorney testified that at the time he did not consider he was representing anybody.

It also appears from defendant's testimony that when the plaintiff was staying at her father's home shortly before the divorce action was commenced, the sister, afterwards appointed her guardian, had taken her to a doctor and that later the father had asked the defendant to pay a "doctor's bill" of some kind. He did not look at the bill; did not accept it. He was concerned about it but didn't ask what was wrong with his wife. He didn't know what was wrong with her. He was still married to her at the time. He said he "wouldn't have anything to do" with what the father had done. The wife's father testified on the hearing of the motion that he showed the defendant the doctor's bill and "told him Irene's in bad shape," and he had "got to take care of her." Defendant said "all right, I'll take care of her." He said as to the bill "Send it to my lawyer." The defendant did not deny this testimony. The defendant was in court when the divorce action was heard but did not testify. He, the plaintiff, both attorneys and the corroborating witness as to residence all went together in defendant's car from Milwaukee to Port Washington when the case was heard and after the hearing returned together to Milwaukee where all of them lived. Florence Bercowski, a sister of plaintiff, testified at the hear-

ing of the motion that she saw defendant on Monday after Easter. We take judicial notice that Easter in 1939 was on April 9th. Defendant then talked to her about his wife. He said she was getting bad. She told defendant they had taken her to a psychiatrist. Defendant claimed he did not see anything wrong with her, but had previously said "he'd have to do something about those [his wife's] moods," of which she had told him. Defendant did not deny this testimony. The plaintiff's brother testified that defendant told him that the plaintiff had tried to commit suicide by turning on the gas, and had blocked the doors with carpets and closed all the windows. Defendant did not deny this conversation, but testified he never told anybody that she attempted to commit suicide and that one time when she turned on the gas some potatoes cooked over and made the flame go out; that he considered it an accident and so did the other people there, but did not give the names of "other people there" or testify what they said. Nobody else gave any testimony relating to the occurrence.

On being asked "Did she run away at any time?" the defendant testified "she left me after one of our squabbles; she went to a woman's home, a friend of my sister;" that he talked with plaintiff's brother about it; he did not remember exactly how long she was gone without his knowing where she was but thought it was a day or two; that he did not call the police.

Mrs. Heine, the movant, sister of plaintiff, testified regarding a two days' absence of plaintiff from home, that defendant asked her if she knew where plaintiff was; the sister answered that she did not. Defendant said he thought she was with her (Mrs. Heine). The sister suggested that he call the police. Mrs. Heine also testified that shortly after this conversation the defendant told her plaintiff was at the "Dells" and that she had "hitch-hiked" there. He did not say he was going after her. He told Mrs. Heine to keep her "hands off his affairs." The defendant did not deny these conversations with Mrs. Heine.

The plaintiff's sister, Florence Bercowski, testified that plaintiff was at the father's home where the witness was living for two weeks prior to the Easter preceding the granting of the divorce; she observed her during her stay and detailed her conduct.   The sister, Mrs. Heine, also saw much of the plaintiff prior to the granting of the divorce and also detailed her conduct.   The plaintiff's conduct was persistently so peculiar that Mrs. Heine took her to Dr. Samuel Plahner for examination on April 1, 1939, just preceding the granting of the divorce.   He testified that she was then insane, and testified as to the facts on which he based that conclusion.   He did not see plaintiff again until October, 1946.   He then examined her again and concluded that the condition he found in 1939 had "continued" and she had in the meantime become "absolutely deteriorated."   There was an extensive cross-examination of the doctor.   We do not discover anything in it to in any way discredit the doctor's testimony as a witness or the conclusions as to insanity that he reached, in either his 1939 or his 1946 examination or anything in the record that could discredit the witness in the opinion of the trial judge and it is upon the record only that the opinion of both the trial judge and this court must be based.

On the evidence above stated and other nonexpert evidence the trial judge found that plaintiff was not insane when the divorce was granted.   The relatives of the plaintiff saw much of her for continuous periods of a week or two at a time while she was living in the same house with them and detailed abnormal actions and conduct of the plaintiff and apparent mental aberration that induced the taking of her to a psychiatrist for examination.   But there was direct and positive testimony by Dr. Plahner, the psychiatrist referred to above, who is licensed to practice in this state since 1922, and a "doctor dealing in mental diseases for forty-three years" who had examined "hundreds of cases of dementia praecox" and graduated from the University of Vienna.   The plaintiff was brought to him for examination April 1, 1939.   He found her

then "insane" and then in need of "immediate hospitalization." He then gave "the address of the probate court where she [sister of plaintiff] could go in order to sign the commitment petition." He then advised that "one does not know what she [the plaintiff] might do to herself or someone else."

Miss White, a psychiatric social worker at the hospital for mental diseases in Wauwatosa where the plaintiff was confined at the time of the hearing, had with her the files of the institution. Objections to the introduction of these files were made, which in general were sustained, but the court permitted the witness to testify therefrom that the plaintiff was admitted to the Wauwatosa hospital July 15, 1941, and had been in the hospital continually since. The witness was permitted to testify that the plaintiff was confined in the Chicago state hospital for five months preceding her admission to the Wauwatosa hospital which makes her admission there only eight months after the divorce trial, and that the hospital record shows that she is afflicted with "dementia praecox, hyperphrenic type." The defendant's counsel does not here object that the parts of Miss White's testimony taken from the hospital record was incompetent or immaterial, and we have no occasion to decide as to its admissibility.

All the testimony that plaintiff was not insane is opinion evidence only and is by nonexperts, and is only to the effect that the witnesses did not observe anything that indicated to them that the plaintiff was insane. We hold that the finding of the trial court that the plaintiff was not insane at the time of the trial is contrary to the great weight and clear preponderance of the evidence.

We will now consider whether the second issue before the court—whether a fraud was committed upon the court was established by the evidence at the hearing upon the motion to vacate the judgment. The trial judge was correct in considering, as stated in his written decision, that "the relief [here] sought is not within the province of a court of equity to grant unless there were extrinsic fraud directly inducing the judg-

ment," citing *Grady v. Meyer,* 205 Wis. 147, 151, 236 N. W. 569.

Besides the facts above stated that indicate collusion in the divorce proceeding, and bear directly upon the question of extrinsic fraud, it is to be considered that the defendant knew, as he admits in his testimony on the hearing of the instant motion, that if the plaintiff was committed to a mental institution he could not get a divorce. He testified to keeping in contact with the plaintiff after the granting of the divorce and helping her in many ways, and claimed to have tried to get her "to come back" during the year following the granting of the divorce, but he never communicated with any of her relatives to help getting a reconciliation. Although knowing of her being taken to the psychiatrist by her relatives before the divorce he did not take her to a doctor to check upon her mental condition. The attorney for the plaintiff testified at the instant hearing that he was informed by the attorney for the movant after he started the divorce that the relatives of the plaintiff had taken her to a psychiatrist and of the latter's opinion that the plaintiff was insane and that movant's attorney had refused to bring action to procure a divorce. This information "startled" the attorney for the plaintiff, yet he did not have the plaintiff examined by a psychiatrist or a physician or take any other means to check up or inform himself as to her mental condition except to talk with her and observe her himself. He did not inform the court or the divorce counsel of having received this information. He told the defendant of the talk with the attorney for movant and the defendant in reply said "very likely Mueller was sore because he had not gone back to him for the divorce." After the talk with Mueller the attorney for plaintiff decided to be "extra careful" to observe the plaintiff and to be "extra careful" in "everything he did." He testified that he tried to get plaintiff to go back to her husband and drew a stipulation for her and the defendant to sign dismissing the case but she did not sign it and said she was going through with it. He presented

it to the defendant to sign instead of presenting it to defendant's attorney. He did not call the defendant to the stand to testify on the divorce trial although he was present in court nor did the defendant's attorney call him, nor did the defendant ask to be called. It would seem that, human nature being as it is, the defendant would have wanted to deny or mitigate or explain his alleged wife-beating, unless he was anxious that the divorce be granted. The defendant's many acts of kindness and helpfulness to the plaintiff during the year after the granting of the divorce were inconsistent with the characterizing of him in the trial court's findings as a wife-beater and that he "exercised a mean . . . nature and disposition toward her." The divorce counsel who saw the plaintiff at the trial and conversed with her testified at the hearing of the motion that if he had noticed anything that "wasn't normal" or "wrong" he would have called it to the attention of the court. This implies that had plaintiff's attorney told him of the claim of the relatives that the plaintiff was insane and that a psychiatrist who had examined her at their request had found her insane he would have told the court about it. The office of divorce counsel was created to protect the interests of the public. It is the duty of the divorce counsel on being informed of a claim of insanity of the wife, to take reasonable means to determine whether she is in fact insane to the end that if she is the husband may not be relieved of the burden of her support and that burden foisted upon the public. Had plaintiff's attorney informed the divorce counsel or the trial judge of the claim of insanity, we have no doubt that the judge would have insisted on the psychiatrist being produced as a witness and that on his testimony being produced a divorce would have been denied and the complaint dismissed.

It does not appear from the evidence whether the plaintiff's attorney informed the defendant's attorney of the claim of the relatives of plaintiff that she was insane or of the finding of the psychiatrist. Knowing of these claims, and not having himself informed either the divorce counsel or the trial judge

of them, it was the duty of plaintiff's attorney to inform the attorney of the defendant of them to the end that the case not go by default, but that the issue of insanity be raised and litigated. In no other way could he have avoided aiding in perpetrating a fraud upon the court if the plaintiff was in fact insane. Thus if the defendant's counsel was not informed, the plaintiff's counsel participated in a fraud upon the court; and if the defendant's counsel was informed he participated in such fraud by not putting the fact of insanity in issue.

Upon the whole record we are constrained to hold that the finding of the court that extrinsic fraud upon the court that induced the judgment of divorce was not proved is also against the great weight and preponderance of the evidence and that the proof to the contrary is established by evidence that is clear and convincing.

From the decision filed by the trial judge it appears that his findings may have been based in part on erroneous views of the law. He states that "The defendant married again in 1941. He served his country long and faithfully, and in view of the long delay in bringing this action, a court of equity, in order to do equity, must refuse to grant relief by way of vacation of the judgment." Obviously the remarriage and army service of the defendant have no bearing on the issue before the court on the motion. The judgment was entered April 20, 1939; the movant was authorized by the county court to make the motion on July 16, 1942. The defendant was inducted into the army on November 2, 1942, and was discharged September 24, 1945. The order to show cause why the judgment should not be set aside was made August 20, 1946. The trial judge after stating the above facts stated: "Although . . . I am not going to decide this case on laches, I am satisfied that this long delay in making this application must be considered by the court in passing upon the merits of the case." The lapse of time was laches or it was immaterial. The public interest is involved in the instant proceedings, and delay of the plaintiff's relations or her guardian short of some

statute of limitation cannot shut off consideration by the court of the public interest.

The trial judge states in his decision "even if the plaintiff was insane, such fact would not deprive her of the right to bring action, and would not deprive the court of jurisdiction." This is beside the point. If the plaintiff was insane and a fraud was perpetrated on the court by not informing the court of the claim of insanity the judgment should have been set aside.

From the record it seems that the trial judge may have considered that whether an insane person may have lucid intervals had bearing upon the decision of the motion. A husband whose wife is insane cannot have advantage of a divorce from her just because she has a lucid interval at the time the divorce was granted if he colluded with the granting of it. Nor is a divorce granted to an insane wife upon her complaint validated because she had a lucid interval at the time the divorce action was instituted and the divorce granted. See *Bradford v. Abend*, 89 Ill. 78, 31 Am. St. Rep. 67; *Birdzell v. Birdzell*, 33 Kan. 433, 52 Am. St. Rep. 539.

*By the Court.*—The order of the county court is reversed, and the cause is remanded with directions to enter an order vacating the judgment, with costs against the defendant.