CARMEN HERNÁNDEZ TORRES, ETC., Plaintiff and Appellant, v. FERNANDO ZAPATER MARTÍNEZ ET AL., Defendants and Appellees.

No. 11567. Resubmitted September 23, 1959.—Decided May 31, 1961.

750

Samuel R. Quiñones for appellant. Félix Ochoteco, Jr. and Antonio Zapater Cajigas, for appellees.

MR. JUSTICE SANTANA BECERRA delivered the opinion of the Court.

Represented by her son and guardian Ismael Zapater Hernández, who was fully authorized by the Superior Court, San Juan Part, to file this suit, the plaintiff Carmen Hernández Torres filed a complaint on August 1, 1950 against Fernando Zapater Martínez, Amelia Cajigas Moréu, Antonio Zapater Cajigas, Beatriz Zapater Cajigas, and her husband Ralph O'McConnie, Amelia Zapater Cajigas and her husband Luis Yordán and Jesús A. Bayran and her wife Beatriz Cajigas Moréu, the defendants. As a first cause of action the plaintiff requested the nullity of the judgment rendered by the then District Court of Ponce on July 21, 1922 which dissolved the marriage between her and the defendant, Fernando Zapater Martínez. In a second and third causes of action, she requested the nullity of certain transactions in which the defendant, Fernando Zapater Martínez, transferred property which allegedly belonged to the conjugal partnership con-

stituted with the plaintiff as well as the liquidation of said community partnership between them.

The complaint having been answered the case went to a trial but was not fully heard because of the resignation of the presiding judge. The defendant, Fernando Zapater Martínez, subsequently died on November 6, 1951. By stipulation of the parties the court rendered an order on July 7, 1953 having as plaintiffs together with Carmen Hernández, her children Ismael, Fernando Manuel, Lydia Elena, and Carmen María Zapater Hernández, and as defendant together with the other defendants, Emma Rosa Zapater Hernández, who refused to join the plaintiffs, and provided, further that the status of defendants of Amelia Cajigas Moréu and Antonio Zapater Cajigas be also that of administrator of the estate of Fernando Zapater Martínez. Thus the case was commenced anew on September 8, 1953 before the trial court. The parties stipulated (R. pp. 566–567) that evidence would be introduced and the suit would be submitted only as to the first cause of action on which the court was to render judgment. The litigants would then be at liberty to request a trial as to the second or third cause of action.

We have before us the judgment rendered in the first cause of action dismissing the complaint. It was alleged therein under oath, that the plaintiff was mentally incompetent in the year 1920, her state of insanity and mental incapacity being continuous, constant and incurable since said date until the present; that her husband, Fernando Zapater Martínez, committed her in the State Insane Asylum on April 14, 1921, where she remained until August 29 of said year when he took her out, recommitting her in September of 1925; that on July 5, 1922 he sued her for divorce for cruel treatment and grave injuries, having knowledge of her condition, and that the divorce decree in said action is void: (a) because she was never summoned or notified of the suit; (b) on July 6, 1922, when the summons were supposed to have been served on her, she was completely insane and never had

knowledge of said divorce action nor an opportunity to defend herself in the same; (c) the return of said summons is void as the court had not acquired jurisdiction over her because it did not state the place where she was served; (d) she was not notified of said judgment nor did she know anything about it, as she was mentally deranged at the time when it is said the judgment was notified; and (e) at the time it is alleged in the complaint that she committed the acts of cruel treatment and grave injuries she was mentally deranged, being irresponsible for all her acts, if any were committed, which might serve as grounds for the complaint.

Documentary evidence admitted in the record without objection, shows that a suit for divorce was filed on July 2, 1922 by Fernando Zapater Martínez, represented by Attorney José Tous Soto, in the former District Court of Ponce, against his wife Carmen Hernández Torres, plaintiff herein, alleging that he had contracted marriage with her on January 14, 1911; that from said marriage, there had been born as their children Carmen María, Lydia Elena, Fernando Manuel, Ismael, and Emma Rosa; that there was no conjugal property and that for two years his wife had been treating him cruelly and abusively, said acts consisting in depriving him of the love and attentions proper of a good wife, and in failing to take due care of him when he was ill, authorizing their children to do acts which had been prohibited by the plaintiff, thereby causing their children to disobey his orders and causing him to lose his moral influence with them; treating him with slandering words such as "scoundrel", "villain", "shameless" publicly and in the presence of their children among whom there were two who had reached the age of reason and, therefore, he was losing the moral authority and respect due him by his children; finally, he alleged that all said acts had affected his state of mind causing him to become ill, and if things were to continue so, his life was in grave danger.

On July 5, 1922 the corresponding summons were issued, which appears to have been served in the following way: "I,

José Cortés González, solemnly swear: that I am of legal age, resident of Ponce, and have no interest in this suit; that on July 6, 1922, I personally notified the defendant Carmen Zapater Hernández Torres of the complaint, of the summons, and of its Service, giving her a true and faithful copy of each of said documents. (Signed) José Cortés González." (Oath.) On July 17, 1922 Zapater filed a motion requesting the Clerk that in view of the summons served the defendant's default be recorded. On July 18, 1922, the Clerk made the following entry: "In view of the preceding motion and it appearing from the record that the defendant was duly notified of said action in Ponce, P. R.[1] on July 6, 1922, without appearing to make any plea against said complaint, the legal period for it having elapsed, I hereby enter the defendant's default. Ponce, P. R., July 18, 1922."

Three days later, on July 21, 1922, the court rendered an opinion and judgment stating the defendant's non-appearance and her default legally entered, and declaring dissolved the marriage between Fernando Zapater Martínez and Carmen Hernández Torres, with liquidation of their partnership, providing that the aforesaid children remain under the custody and patria potestas of the father. The divorce records show what seems to be a notice of judgment dated July 26, 1922. The court stated that it did not provide as to conjugal property "because there were none in said conjugal partnership."[2] (R. pp. 238–245; 428.)

The trial court decided, using its own words, that "[A]t the date the divorce complaint was filed, plaintiff herein was

---

[1] The record did not state that the defendant therein, Carmen Hernández, was summoned in Ponce.

[2] In the record of this case there is documentary evidence admitted without objection, from which it appears that on June 10, 1922, 25 days before the complaint was filed, and by deed No. 152 executed in Ponce, before Notary Eduardo Flores Colón, Fernando Zapater, appearing for himself and as attorney-in-fact of his then wife Carmen Hernández Torres by virtue of the power of attorney granted by her by deed No. 119 of December 16, 1920, before Notary José Tous Soto, sold to Aurelio Maldonado a property belonging to the conjugal partnership had in 1915 by a sale of redemption,

summoned, her default entered, and judgment rendered and notified, she was mentally deranged (dementia praecox)."

Because of the serious implications that a conclusion of such nature has in the disposition of this case, we have carefully studied the lengthy evidence in the record as to plaintiff's mental condition with special attention to the expert evidence presented by both parties of doctors of unquestionable reputation in the psychiatric field, and without failing to give the defendants' medical proof in all its integrity the value which it has and which corresponds to it in the record, which proof, far from creating a conflict with the medical proof of the plaintiffs in general, corroborates its conclusions, we are convinced that the foregoing conclusion of the trial court is supported by the great preponderance of the evidence. Said proof, in its essential aspects is summarized as follows:

"Dr. Pérez Marchand testified that she assisted the plaintiff at childbirth in 1920 [3] in Hospital de Damas, and after birth, which was normal she started to observe that the patient developed and was absorbed in a great apathy, which condition increased to a point that when she left the hospital she recommended the husband to take special care because she observed in the patient certain mental conditions that were not proper in a normal case. She later visited plaintiff for a period of time at her home, following her mental condition which was in progress, and as it did not become normal she dropped the case as she

located at the end of Cristina Street, of three cuerdas, 47 hundredths, with a house, for the price of $4,000 of which the buyer retained $1,000 to pay a mortgage on the immovable and the vendor admitted having received the remaining $3,000 prior to said act. By deed No. 194 executed before the same notary on August 12, 1922, when judgment had not yet become final, Aurelio Maldonado sold said property to Fernando Zapater who appeared at said act as "single by divorce", for the same price and in an identical manner of payment. Deed No. 152, in which Zapater sold said community property, as well as Deed No. 194, in which he acquired it again as single, were recorded in the Registry on the same date, January 18, 1923 (R. pp. 375–384; 471–476). It was alleged in the complaint and the defendants so accepted, that by the same power of attorney of December 16, 1920, Zapater sold other three community properties. The evidence in the record showed, as we shall see, that since August 1920 plaintiff herein Carmen Hernández was mentally ill.

[3] Birth occurred on August 10, 1920.

believed the same needed specialized psychiatric treatment which was not within her field. Dr. Pérez Marchand described the plaintiff during this period as in a state of personal neglect, her thoughts morbid, distracted, apathetic, nearly complete "negativity" towards everything, her personal care, baby's attention; progressive outstanding abstraction, physical deterioration, with no interest in the doctor nor in the medicine which she refused; she hardly talked, her personality in motherly relations with her child was completely negative; abandonment and neglect which tended towards a state of chronic dementia praecox, as the case was later diagnosed. In the prenatal period she already showed a morbid apathetic condition, her mind and actions were dull which condition increased; after childbirth she seemed plunged in a negative state of mind, indifferent to everything, without violence and aggressiveness; a state of oblivion of her surroundings. She listened but did not pay attention or she paid attention but did not listen, a static attitude because the mental dynamism did not appear. The case was one of a mental blank, an absolute negativity, without aggressiveness or impulsivity; her brain was a blank board."

At that time the plaintiff was living with her husband, her children, and her parents in the same house on Cristina Street. On the witness' recommendation and due to the psychiatric treatment required by the plaintiff, Zapater committed his wife in the State Insane Asylum on April 14, 1921. In the medical certificate for admittance, signed by Dr. Pérez Marchand, the maternal grandmother is mentioned among the parents who suffered psychosis, and two aunts, the mother's sisters, of dementia praecox. Some years later, in 1925, the doctor saw her at the Asylum and said it was the same patient she had seen, the symptoms a little accentuated and the general feebleness; and the same apathetic, morbid, and unconscious state. On August 29, 1921, on Zapater's request, the plaintiff was released from the Asylum under a diagnosis of acute melancholia, stating that she was "calm" in her mental disorder. It was pointed out that the patient should remain in isolation.

On September 29, 1925, at the request of Zapater, the plaintiff was recommitted to the Asylum where she remained

until October, 1936. According to a certificate from Dr. Santaella for her commitment, she was mentally deranged. The symptoms of insanity are described in the record: melancholia, exaltation, delirium of persecution, loss of reflexes (and others stated not legible), tendency or impulse to suicide, and that it could be considered a dangerous case of insanity. In a memorandum to the Superintendent entitled "Meeting of the Faculty on April 22, 1935," the Chief of the Psychiatric Clinic, Dr. Luis M. Morales, stated that the plaintiff was a case of dementia praecox with clear evidence of delirium, but he had no objection in granting the permission for 15 days at her home under the custody of her guardian. After her commitment in 1925, the plaintiff left the Asylum on October 21, 1936, under the provision of "Released without Improvement." She was recommitted, at the request of a third person, on November 14, of the same year. A note by the Superintendent of the Asylum, Dr. Dolores M. Piñero, of August 27, 1940 referring to her recommitment since November 14, 1936, states that she has been subject to periods of exaltation, preceded by indifference and isolation; impaired judgment and autocritic. Physically very poor. Considering her conduct and her physical state she recommended her release at the request of her guardian, under the diagnosis of dementia praecox.

According to the testimony of Dr. José D. Jiménez, medical expert of the defendants, he examined the plaintiff at the Juliá Clinic between August 29 and October 10, 1940, and made a diagnosis of dementia praecox, paranoic type, chronic. Dr. Ramón Fernández Marina examined her in the year 1951 and found her in a state of dementia, deteriorated; a complete state of the dementia process. She was recommitted to the Asylum in 1952 and at the time of the trial of this case she was committed there.

In regard, particularly, to the period between August 29, 1921, when the plaintiff was released from the Asylum and September 29, 1925, when she was recommitted, during

which period the divorce occurred, the record shows by a preponderance of the evidence—which was corroborated in many points by that of the defendants, although it was contradicted in many others—the existence of a mental state accompanied by acts and behavior of the plaintiff which taken together with her previous and subsequent clinical history led Dr. Fernández Marina to conclude that after Dr. Pérez Marchand had sent her to the Asylum for the first time, the plaintiff has been suffering of a psychotic process, "demential" type, processual, dementia praecox. The doctor explained that by "demential" it was meant loss of mind, and by processual, it is a state which follows a process of deterioration, without outbursts, continuous, incurable, which was also explained by the defendants' witness, Dr. Jiménez, as a manifestation of an abnormal chronic conduct, progressive, aggravating, in which the mental faculties become dull and tend towards the abnormal; carelessness, neglect, bluntness of judgment in such a way that recovery is impossible, or at least difficult. It was Dr. Fernández Marina's opinion that under this demential, processual type there were no periods of lucidity or of recovery. The specific previous medical conclusion about the schizophrenic condition of the plaintiff since she was first sent to the Asylum, deteriorating and continuous, without periods of recovery or lucidity, is not challenged or overcome in the record.[4]

---

[4] There is sufficient detailed evidence in the record, corroborated in many particulars by that of the defendants, as we have said, about acts, condition and conduct of the plaintiff during the period of which it refers and in which the divorce occurred, including a frustrated suicide, which clearly show, even to a layman, a mental state of insanity. Since we agree in the conclusions of the trial court we need not recite here a more detailed statement of said acts and conduct of the plaintiff. As to a question asked by the defendants to Dr. Fernández Marina about the summons, the expert answered, upon being examined by plaintiff, in regard to the specific case, that if the described symptoms were true she was away from reality and could not realize what a summons was or what she received. He explained that the concept "calm" in the Asylum's release of August 29, 1921 meant that she was not aggressive but did no mean that she was well. The expert physician for the defendants testified that it could be interpreted as if there

Up to what point was Zapater conscious of the mental condition of his wife, the record says: His sister Esther Zapater testified that after the plaintiff returned from the Asylum she was the same or worse. Zapater lived in the house a few more months, and then went to live with the witness and to a hotel because, as he said, he was determined to get a divorce "because he could not live a life chained to a crazy woman." At that time, the witness states, that she saw the plaintiff in disastrous conditions, abandoned, and behind locked doors. She refused to eat and would not associate with anyone. She talked nonsense. Her oldest daughter Carmen, 12 years old then, said that when she found out about her father's second marriage in 1923, she talked with him and he said that he had to do it, that he had divorced her mother because she was crazy and he could not live with a crazy woman, a person who could not take care of him. Attorney Fornaris testified that Zapater, with whom he had a close friendship, often complained to him after bringing her from the Asylum, that his wife was in a state that did not permit him to rest, and later, in 1922, he told him that he had to get a divorce because he could not continue the life he was living, to which the witness commented that in his opinion she was completely deranged and it was a serious step, not the step in itself, but the consequences following. At the trial Zapater asked him to introduce the evidence because his attorney, Mr. José Tous Soto, had not arrived, and the witness refused to intervene.

At the time of the divorce Zapater had a job as a clerk in the office of Attorney José Tous Soto with whom he had been working for many years and he practically ran with the office. José Cortés González worked there as a messenger. Cortés

was the possibility that she was much improved or recovered, and added, that if she behaved normally at her home (evidence showed that this was not so) there existed the possibility that she had recovered, although he stated that if it were a case of recovery they should have written down "recovered" and not "calm". For them, he explained, "calm" means serene, "quiet."

died on December 12, 1924. After the divorce the plaintiff·
went to live with her children in a house at Condado Street,
in the mental state she was in; from there to another house
in the Ward of San Antón; later she lived in Corral Viejo,
and in 1925 she returned to the Asylum. Zapater married
for a second time on March 31, 1923 to Amelia Cajigas, with
whom he had three children.[5]

The plaintiffs-appellants allege in this appeal that the
trial court erred (1) in concluding that Zapater Martínez
could file and obtain a divorce action against his insane wife
and obtain a judgment against her on said action; (2) in not
declaring that the acts stated as grounds for the divorce were
committed by Carmen Hernández while she was insane, and
so the judgment rendered against her which was based on
said acts is null; and in not concluding that the fact that
Fernando Zapater had kept from the court that when said
acts occurred his wife was insane, was a deceit on the court
which renders void the divorce decree obtained by him against
her; (3) in not establishing that the summons, judgment and
notice of the judgment in the said divorce proceedings were
null and void; (4) in refusing to admit in evidence documents
appearing in the record of Carmen Hernández at the Psy-
chiatric Hospital, and (5) erred in weighing the evidence and
in rendering judgment on said erroneous appreciation. The
third error raises a jurisdictional question to which we shall
turn immediately.

After having made the above copied finding as to
the mental state of the plaintiff, the trial court decided, as
a matter of fact, that when the default was entered in the
action for divorce, there did not appear in the return of the
summons the place where the plaintiff had been served; that

---

[5] There is documentary evidence in the record, admitted without objec-
tion, which establishes acquisitions, conveyances and operations of im-
movable property made by Zapater after his second marriage. In view of
the fact that the case was limited to the first cause of action it is not neces-
sary to study such evidence.

the spouses Zapater lived in Ponce since a date previous to 1920 and had their residence there at the time of the aforesaid action, and that the District Court of Ponce had jurisdiction and was competent to take cognizance of the case. The trial court did not specifically find whether or not the plaintiff was duly summoned in the divorce suit. Although the complaint alleged that she was never summoned, aside from the return itself, there is no proof in record that affirmatively shows the fact of whether or not she was personally served. Notwithstanding the attendant circumstances at that time as to plaintiff's condition tending to show that she was not very communicative, we shall have to agree, based on said return, that the plaintiff was notified. *Cf. Heirs of Ramírez* v. *Troche et al.*, 39 P.R.R. 357. Freeman, on Judgments 2553–61.

As a question of law the court concluded that the failure to state in the return the place where it was served, does not render it void nor is the court divested of jurisdiction over the person, by invoking our ruling in *Ortiz* v. *Municipal Judge*, 26 P.R.R. 267. The *Ortiz* case as well as that of *Llorens* v. *Castillo*, 22 P.R.R. 624, on which it relied, and those of *García* v. *Brignoni et al.*, 22 P.R.R. 321 and *García* v. *García*, 22 P.R.R. 663, dealt with a different situation, which was the failure to state on the back of the copy of the summons served on the defendant, the date and the place where it was served. Section 92 of the Code of Civil Procedure, as amended in 1911, required that upon serving a copy of the summons the officer serving it shall endorse it with a literal copy of the service and its date as shown in the original. Subsequently, in 1915, said section was amended to require only that the copy of the summons shall be endorsed with the date and place of its delivery and not with literal copy of all the service as shown in the original. Following the ruling of the *Llorens* case, where it was said that said omission is an irregularity and does not vitiate the service, we decided in *Ortiz* to that same effect, pointing out the fact that the defendant therein did not allege that he had been led to error in the computation

of the time to make allegations by the failure to endorse the place and date of service on the copy or that he had been prejudiced in any other way in his substantial rights.

The question here involved is different: the failure to endorse the service with the place where it was served (nor does it show either that it complied with the provisions of the 2d paragraph of § 92), and was governed then by the provisions of § 97 of the Code of Civil Procedure to the effect that the proof of the summons and service of the complaint, if not served by the marshal, would be a certificate or affidavit of the person serving it, which certificate or affidavit must state the time and place of service. The return in this case did not state the place where plaintiff was served. In *Andino* v. *Knight*, 20 P.R.R. 185, we said that in order to be considered valid, the service of a summons must show per se that all the necessary requisites have been complied with and, it must show, among other things, the place where the service was made. In the absence of proof in the return of the requisites of §§ 92 and 97, we held in said case that the clerk was not authorized to enter *validly* the default, nor the court to acquire jurisdiction over the defendant therein to try him, and we set aside the judgment by default. We also said that it was not sufficient that the default had been entered but that the lower court should have ascertained that his default had been entered *validly* by the clerk.[6]

---

[6] In 1922 when a single judicial district did not exist, the absence of proof of the place where the service was made substantially affected the fact of a valid entry of default and the pronouncement of the corresponding judgment, since the period to answer varied from ten to twenty days if the service was made outside the judicial district. The record shows that the default in this case was entered eleven days after notice to the plaintiff, and since it was made by one other than the marshal of the court, it could not have been presumed that it was made within the district. *Cf. Lynch* v. *West*, 60 S.E. 606 (W. Va.), where it was said that the presumption in favor of an *officer* that he has served the summons within the district does not favor an individual in particular and his statement, besides stating the time and manner, should also state the place of the service. In *Crane* v. *Brannan*, 3 Cal. 193 (Cal.), the place of the summons was not stated but since the service was made by the marshal, it was said that the court should have presumed that it was served within the jurisdiction of said officer.

Section 98 of the Code of Civil Procedure, 32 L.P.R.A. § 462, provided that from the time of the service of the summons and of a copy of the complaint in a civil action, where service of a copy of the complaint is required, the court is deemed to have acquired jurisdiction of the parties, and to have control of all the subsequent proceedings. In *Orcasitas* v. *Márquez*, 19 P.R.R. 454, we stated with a view to a defective service considered as of an individual person, that in order to bring a defendant under the jurisdiction of the court he must be summoned in the manner prescribed by law *and, furthermore*, a return be made to the court showing that the summons was served, in which there shall appear that the statutory requirements have been complied with. Without the due return that the summons had been served when the default was entered and the judgment recorded, the defendants were not yet under the jurisdiction of the court. See *Serrano* v. *Berdiel et al.*, 22 P.R.R. 416. In *Torres and Enseñat* v. *Alfaro*, 24 P.R.R. 683, we added that although it was true that under § 98 of the Code of Civil Procedure the court had acquired jurisdiction "from the time of the service of the summons and a copy of the complaint," it was necessary that the court have before it authentic proof of the service in the form of a return in accordance with the law, this being the only means by which the court could determine whether it had acquired jurisdiction over the person of the defendant. The judgment by default rendered against the defendant was rendered null on its face for lack of jurisdiction. And in *Delgado* v. *Registrar of Humacao*, 25 P.P.R. 450, a note of refusal to record a possessory title was upheld, because among other defects, the service did not state the place and date in which the summons were made, following the doctrine of the *Knight* case.

In *Quintana et al.* v. *Aponte*, 26 P.R.R. 169, we decided that the court acted without acquiring any jurisdiction over the defendant and we set aside a judgment by default and the subsequent auction held 10 years previously, when the serv-

ice did not state that the person who made the summons was over 18 years of age. However, this case suggests the principle of the proof *aliunde*, and we stated the fact that in discussing the petition for the nullity, the party to whom judgment was granted did not appear nor did he allege in regard to said petition that the server of the summons was really over eighteen years of age, nor did it show that it was sought to amend the return *nunc pro tunc*. In *Buonomo* v. *Succession of Juncos*, 28 P.R.R. 380, the validity of a title obtained by a judgment was declared void for lack of jurisdiction and it was alleged that the return did not show that the person was over 18 years old, nor the place where it was served. We upheld the nullity of the judgment and of the title obtained thereby for lack of jurisdiction over the person of the defendants following the ruling in *Andino* v. *Knight*. However, we said that "the question having been raised and the defendants having had an opportunity to prove that the process server was of the age required by law, they did not do so."

In *López et al.* v. *Quiñones et al.*, 30 P.R.R. 317, we affirmed the judgment of the lower court declaring void the summons, the judgment and sales made by virtue thereof, and ordered the cancellation of the record and the restitution of the property, in another of the cases in which the return did not state that the person was over eighteen years old, and had no interest in the suit. We also noted that no proof had been presented stating that the process server was more than eighteen years old when he served the summons, wherefore it was concluded, as did the lower court, that the services of the summons were null, the court did not acquire jurisdiction over the defendants and the subsequent proceedings were null. In *Rivera* v. *Rivera*, 31 P.R.R. 428, a divorce suit, it was stated in the service that the person was 53 years old but it did not appear on the part under oath. We said that the jurisdiction of the court did not properly appear from the record and we set aside the judgment. We stated therein that the wife had not been summoned in full compliance with the law and if

there are occasions when the technicalities of the law favor the administration of justice, this was one of them. In *Banco Comercial de P. R.* v. *García*, 51 P.R.R. 712, we reaffirmed the doctrine of *Andino* v. *Knight* and the following cases, holding that there was no jurisdiction over the defendant party when the service does not state the fact that the process server is over 18 years old.

In *Ortiz et al.* v. *San Miguel*, 34 P.R.R. 222, the doctrine of evidence *aliunde* was stronger. It was a suit for revendication of property acquired by virtue of certain judicial proceedings in which it was alleged that the return did not show, in the affidavit of service, that the person was over 18 years old, he had no interest in the litigation, nor the place of service. We accepted that the service was defective but we refused to set aside the proceedings because there was evidence *aliunde* to show that the requisites omitted from the service were complied with at the time of serving the summons, that is, that the person was really over 18 years old and was no party to nor had any interest in the litigation. See: *Isaach* v. *Del Toro*, 33 P.R.R. 959; *Heirs of Ramírez* v. *Troche et al.*, *supra*; *Hostos* v. *Larrazábal*, 45 P.R.R. 491; *Arrarás* v. *Arzuaga*, 53 P.R.R. 680; *Rivera* v. *De Arce*, 55 P.R.R. 323; *Rodríguez et al.* v. *Cuevas Zequeira*, 25 P.R.R. 751; *Campos* v. *Central Cambalache*, 64 P.R.R. 57; *López* v. *Meléndez*, 22 P.R.R. 145. *Cf. Lawton* v. *Porto Rico Fruit Exchange*, 42 P.R.R. 282.

On the other hand, we have set aside the proceedings for absolute lack of jurisdiction when the summons per se have not been served according to law. *Gaudier* v. *Estate of García*, 10 P.R.R. 25; *Vías* v. *Estate of Pérez et al.*, 15 P.R.R. 714; *Orcasitas* v. *Márquez, supra; Hernández* v. *Rosado et al.*, 22 P.R.R. 360; *Federal Land Bank of Baltimore* v. *District Court*, 45 P.R.R. 113; *García* v. *Dávila*, 45 P.R.R. 159; *Rodríguez et al.* v. *Alonso et al.*, 37 P.R.R. 322; or when the return in itself is so defective that even when the defendant is properly summoned, the court does not acquire

jurisdiction. *Andino* v. *Canales*, 26 P.R.R. 122; *Ramos* v. *Sellés, Casas & Co. et al.*, 37 P.R.R. 563; *Martínez* v. *Figueroa*, 50 P.R.R. 908; *Vías* v. *Estate of Pérez, supra.* And see: *Freiría & Co.* v. *R. Félix Hmns. & Co.*, 20 P.R.R. 148.

Our decisions show that a mere irregularity in the procedure of the summons of a defendant and of the evidence thereof does not render the judgment in default void at its roots which, otherwise, and in the absence of voluntary submission, would be erroneous or voidable. In the present case it did not appear from the record that the Secretary had the authority at law to validly enter the default of plaintiff herein in that divorce suit because of lack of proof as to the place of service, particularly, when at the time said default was entered and judgment was rendered three days later, the period of twenty days allowed when summoned outside the judicial district had not expired. But as it appears that the plaintiff was served personally, by a person who swore he was of age and with no interest in the litigation, the judgment by default so entered is not void for lack of jurisdiction, but merely illegal and erroneous, subject to be reversed or set aside. Notwithstanding the fact that said judgment is voidable, we shall not set it aside on that ground since from the evidence introduced by both parties, specially by the plaintiff herself, it appears and we are convinced, that after she returned from the Insane Asylum on August 29, 1921, and until she was divorced in July, 1922, she lived in her home on Cristina Street in Ponce, without ever leaving said place. We have no doubt from said proof that the summons was made within the judicial district and that when the default was entered the period allowed plaintiff to appear had expired. Having decided the question relating to the nullity of the proceedings we shall turn to the other errors assigned.

The first error charges that the trial court erred in concluding that Fernando Zapater could file and maintain a divorce action against his insane wife and obtain judgment against her. The trial court decided as a matter of law, rely-

ing on our decision in *Subirana* v. *Cortada*, 38 P.R.R. 183, that an insane person could be sued for divorce; that the personal service of the copy of the complaint and summons even when the defendant is insane but had not been judicially declared incompetent was sufficient; the lack or omission of the appointment of a guardian ad litem did not vitiate the divorce proceedings, and that the appointment of a guardian ad litem was a matter of procedure and not of jurisdiction, citing *Trueba et al.* v. *Martínez et al.*, 33 P.R.R. 446.

We will not hold, as a general proposition, that an insane or mentally incompetent person is excluded by said fact from the jurisdiction of the courts, either as plaintiff or as defendant. Section 93, subdivision (4) of the Code of Civil Procedure—32 L.P.R.A. § 457—provided that if the suit is against a person residing within said Island, who had been judicially declared to be of unsound mind or incapable of conducting his own affairs, and for whom a guardian had been appointed, the summons must be served by delivering a copy of the same to said person and his guardian. Sections 56 and 57 of the same Code bear relation to each other—32 L.P.R.A. §§ 306, 307. Section 56 provided that when an infant or an insane or incompetent person is a party, he must appear either by his general guardian or by a guardian ad litem appointed by the court in which the action is pending, in each case, or by a judge thereof. A guardian ad litem may be appointed in any case, when it is deemed by the court in which the action or proceeding is prosecuted, or by a judge thereof, expedient to represent the infant, insane or incompetent person in the action of proceeding, notwithstanding he may have a general guardian, and may have appeared by him. Section 57 provided that when a guardian is appointed he must be appointed as follows: when an insane or incompetent person is a party to an action or proceeding, upon the application of a relative or friend of such insane or incompetent person, or of any other party to the action or proceeding.

In *Subirana* v. *Cortada, supra,* the wife charged the husband with acts of cruel treatment and grave injuries taken place prior to his insanity. At the time the complaint was filed the defendant did not live in Puerto Rico and having been returned without it being served the summons was served by publication in the ordinary way. The default having been entered for his nonappearance, the court took two depositions, one from the plaintiff and the other from her father. In her deposition the plaintiff stated that her husband had been taken ill in 1925 and was in a sanatorium. The father also stated that since 1925 the defendant had become insane and had been confined since then in a sanatorium in New York, as a consequence of mental derangement. After having made these affidavits the plaintiff asked that the court appoint a guardian ad litem for her husband, and to that effect, she presented a physician's certificate that he was confined in an asylum in New York since July 1925; suffering from mental derangement and was incompetent. The trial court disposed of the motion by an order dismissing the complaint because the summons and service of the defendant were defective, the court had not acquired jurisdiction over the defendant, and because since the defendant was insane or presumed to be insane, his incapacity should have been determined first, and a guardian and not an attorney should have been appointed to represent him. Before said situation we said reversing the trial court, that an insane person can be sued although the action may be for divorce based on acts committed prior to his insanity, as was in that case. We upheld the validity of the summons by publication since the defendant was not in the Island, and having been summoned thus, the court acquired jurisdiction over his person, and there only remained the manner of securing the appearance of the defendant who was insane. We concluded that subdivision 4 of § 93 was not applicable because that provision had reference to persons residing within the Island, in which there had been a previous judicial declaration of insanity or incapacity, and the appoint-

ment of a guardian, and said provision did not apply to cases in which the summons was made by publication, apart from the fact that it was presumed that there existed a previous judicial declaration of insanity or incapacity as well as the appointment of a guardian. Pointing out that our statutes did not say anything with respect to summoning an insane defendant who was absent from Puerto Rico, we followed the general doctrine that jurisdiction may be obtained ordinarily over an insane person by the like process as if he were sane, unless the statutes provide a certain manner of summoning an insane person. We also stated that it is the policy of the legislature and of the courts to give full protection to the rights and interests of insane litigants and in the absence of a statute regulating such power it is the duty of the court to determine the mode and manner of exercising it for that purpose, with authority for that purpose to appoint a person to represent the insane person when jurisdiction to hear and determine the matter has been acquired whether a resident or not, and although said person may not have been judicially declared insane and no guardian had been appointed to represent her.

Referring to §§ 250–256 of the Civil Code (§§ 180–186, 1930 ed., 31 L.P.R.A. §§ 703–709) as to the procedure of declaring a person incompetent for mental derangement or total insanity, we said, in a general way, that the person having to litigate with an insane person is not granted by law the right to apply for the declaration of his incapacity and the appointment of a guardian, although in that case, the plaintiff being the wife of the defendant the latter might have applied for it. Consequently, the litigants are not bound to have the incapacity of the person whom they are going to sue previously declared. We then referred to the provision of § 56 of the Code of Civil Procedure which permits the court or the judge to appoint a guardian to the insane person, although he may have a general guardian, and the appointment may be requested by the opposite party. For those reasons, inasmuch

as the trial court had acquired jurisdiction over the defendant by the summons by publications, and the court had had its attention called to his insanity, proved by doctors' affidavits, we held that the appointment of counsel should be made and the judgment was reversed.

In *Fuentes* v. *Federal Land Bank*, 64 P.R.R. 193, the question was raised as to whether the fact that the debtor therein was insane at the time she was served with process in the mortgage foreclosure proceeding, annuls said proceeding. We said then: "The plaintiffs have sufficiently proved that Carmen Fuentes was insane when she was served with process in the foreclosure proceeding. However, she was never judicially incapacitated. This being so, subdivision 4 of § 93 of the Code of Civil Procedure does not obtain in the service of process in the foreclosure proceeding which confines its provision to the manner of summoning a person who has been judicially declared to be of unsound mind, but since there is no special law providing the procedure to summon an insane person who has not been declared incapacitated, the service of summons in the foreclosure proceeding must follow so far as possible, the general rule provided by subdivision 6 of § 93 as it was done in the present case.* The demand thus made is valid and sufficient to vest the court with jurisdiction, and consequently it did not avoid the foreclosure proceeding."

In *Trueba et al.* v. *Martínez et al.*, *supra*, we dealt with some minors which appeared at the trial, asked to be made parties in the suit, and were admitted and a guardian ad litem was appointed to represent them. Afterwards when alleging the nullity of the proceedings they attacked the validity of the appointment of a guardian ad litem. We held that the appointment of a guardian was made in accordance with § § 56 and 57 of the Code of Civil Procedure and the appointment rested on the sound discretion of the court,

---

* Subdivision 6 of § 93 provided: "In all other cases the defendant himself."

although the minor may have a general guardian. In the course of the discussion we said that in any event the case law maintained that the appointment of a guardian ad litem was a matter of procedure and not of jurisdiction.

In *Díaz* v. *Quiñones*, 68 P.R.R. 232, the lower court set aside a public sale in a foreclosure proceeding because the demand of payment was made without the appointment of a guardian ad litem for the defendants who were minors. Upon reversing the judgment citing the case of Trueba, *supra*, we said that under § 56 the omission to appoint a guardian in cases where the appointment lies was an irregularity which did not affect the jurisdiction of the court. But we stated, however, following the California decision that although the omission was not a jurisdictional question, the judgment, as a general rule, could be annulled on motion of the minor during a reasonable time after he had attained the age of majority, and that if this had been a case other than a foreclosure proceeding, we would have to decide that the trial court acted correctly in annulling the proceeding for the failure to appoint a guardian for the minors. But due to the nature of a foreclosure proceeding we were precluded from reaching such a conclusion, because the object of a guardian being to represent the minor in the *appearance* he must make, in a foreclosure proceeding the defendant has no right to appear except under the three circumstances enumerated in § 175 of the Regulation for the Execution of the Mortgage Law, and the conditions mentioned in said § 175 were not present in said foreclosure proceeding against the minors. For those reasons we concluded that no prejudice was caused to the minors by the omission to appoint a guardian in a case where they, as the opinion says, could not have appeared, even through a guardian.

*Tyrell* v. *Saurí*, 71 P.R.R. 429, was an action for declaration of prodigality in which a trial for default was held. We

held that the court did not lack jurisdiction because of the fact that at the trial for default he was not represented by a guardian ad litem. Interpreting Rules 17(f) and g(3) of Civil Procedure of 1943, substantially equivalent to §§ 56 and 57 of the Code, we said that the provisions of said Rules presuppose that the party in suit is an infant, or an insane or incompetent person, and in said case they were not dealing with an insane or an incompetent person, since the purpose of the action of prodigality is precisely to determine whether the defendant had capacity to manage his estate, and it did not imply, if he was not, a declaration of complete incapacity. We distinguished the proceeding from an action to declare a person incompetent under § 182 of the Civil Code which requires the appointment of a guardian to the presumed incapable and who does not wish or is unable to defend himself, and we reaffirmed what was said in *Trueba*, that the appointment of a guardian is a procedural and not a jurisdictional question. California and New York, where provisions similar to our § 93 prevail, have also established that an insane person not judicially declared so and to whom a guardian is not appointed, is summoned in the same manner as a sane person. See: *Dunn* v. *Dunn*, 46 Pac. 5 (1896); *Sacramento Bank* v. *Spencer*, 53 Cal. 737 (1879); *Olivera* v. *Grace*, 122 P.2d 564, 568 (1942); *Briggs* v. *Briggs*, 325 P.2d 219, 222 (1958), 40 Cal. Jur.2d 54, 55; *Jacobs* v. *Jacobs*, 217 N.Y.S. 280, 282 (1926) affirmed 217 N.Y.S. 918; *Dunn* v. *Dunn*, 216 S.W.2d 141 (1949).

Pursuant to the aforesaid authorities we must agree that the plaintiff, Carmen Hernández could be sued for divorce notwithstanding her mental state, and even when her husband knew of her mental condition, and he was the person with authority to obtain in the first place a judicial declaration of her incapacity and the appointment of a guardian for her in accordance with § 181 of the Civil Code—31 L.P.R.A. § 704— the summons served on the insane person of his wife did not

preclude the court, on that account, from having jurisdiction to take cognizance of the suit for divorce.[7]

 The trial court decided the case on the aforesaid findings and dismissed the complaint. It mentioned nothing, nor did it decide about the other contentions in the suit, which were directed to obtain the nullity of the divorce decree, and on which the suit mainly centered. This leads us to consider the grounds of the second assignment of error: in not setting aside the divorce judgment obtained on the basis of alleged acts committed by the plaintiff and for which she was not responsible because of her mental state and the concealment from the court on the part of Fernando Zapater as to the mental state in which his wife was, notwithstanding the fact that the trial court concluded that the plaintiff was schizophrenic, it made no pronouncement at law regarding this other aspect of the case. As it is stated in the record, the contention delves deeply in the conscience as to what should

[7] As stated in Annot., 19 A.L.R.2d 180, 182, some of the early cases established the rule that the insanity of the defendant spouse would preclude the filing of a divorce action or abate one already instituted for the reason that an insane person is incapable of defending himself, following the rule of the criminal cases in which an insane delinquent can not be tried, though he was sane at the time he committed the crime, since a sound mind is a prerequisite to his defense. This view no longer prevails in modern times in which an action for divorce may be instituted against an insane person for acts constituting grounds for divorce committed prior to the insanity. And the main reason is that his defense may be committed by the court to a *guardian* ad litem upon whom service of process will be made; and in those cases in which there is no acknowledgment of incompetence and no guardian appointed, may be likewise sued since the court, once *informed* of his insanity, must appoint him a guardian. For these reasons the courts have stated that the incompetent spouse is not in a disadvantageous position in a divorce suit as he would be in another kind of litigation. However, the courts have laid stress on the fact that the action should be stayed until a judicial guardian has been appointed to the incompetent spouse.

In the *Subirana* case, as in many other reviewed cases, acts were alleged as constituting ground for divorce occurred prior to the insanity of the defendant spouse. It is clearly established, with the due protection to the procedure of the appointment of a guardian, that in said cases the insane spouse may be sued, and if the acts committed while he was sane are proved, a divorce decree may be rendered. See Annotation cited; *Nelson v. Nelson*, 350 P.2d 702 (Or. 1960); *Quinn v. Quinn*, 83 S.W.2d 269 (Tenn. 1935);

be an equitable and just judicial proceeding which shall not render unreal the full sense of the right of a defendant to be heard and defend himself before judgment has been rendered against him.

In *Subirana* we held that the divorce action lay against an insane spouse but we pointed out that in the weighing of the circumstances as a whole, as to the aspect we are now considering, it has a greater bearing that the acts constituting the grounds for divorce were committed prior to his insanity. In that of *Fuentes* v. *Federal Land Bank, supra,* although we upheld the demand for payment made personally on that insane person, we deemed it advisable to add that:

"In the United States the courts of equity, although holding that the service of process on an insane person who has not been judicially incapacitated is not void nor even voidable, yet they grant a remedy to the insane, setting aside the judgment when there has been fraud or when the plaintiff has obtained an undue advantage over the insane or when the judgment is unfair or contrary to the evidence. But the general rule is, that equity will not interfere unless it appears that the insane person has a meritorious defense or that a new result would be reached if judgment were vacated and he were given an opportunity to be heard. Annotations in 34 A.L.R. 221, 140 A.L.R. 1336."

After stating the foregoing we also deemed it appropriate to make this exception:

"In the present case the bank did not take any undue advantage over the insane person. The debt claimed was legitimate and the adjudication of the property to the bank for the amount of $6,000 did not prejudice Carmen Fuentes at all, inasmuch as the

---

*Cobb* v. *Cobb,* 143 P.2d 856 (Wash. 1943); *Dunn* v. *Dunn,* 216 S.W.2d 141 (Mo. 1948); *Harrigan* v. *Harrigan,* 67 Pac. 506 (Cal. 1902); *Olivera* v. *Grace, supra;* and Annotation following in 140 A.L.R. 1336.

The case now before us presents the problem, which we did not have in *Subirana,* that during the period in which it was alleged in the divorce suit that acts of cruel treatment and grave injuries were committed, the record shows beyond any doubt that the wife was already suffering of mental derangement. It having been established that an insane spouse may be sued, the question of insanity turns on the merits of the case, whether the action should or should not prosper on the basis of the legal responsibility

trial judge himself found that the property at the time of being adjudicated in the foreclosure proceeding was worth $6,000. Furthermore, the bank after taking steps for the sale of the property for sometime, could not obtain a higher price than the one paid by José Manuel Medina on March 25, 1938, that is $4,100."

In *Díaz* v. *Quiñones, supra,* notwithstanding that the validity of a foreclosure proceeding instituted against minors to whom a guardian had not been appointed was upheld, we pointed out that if it had been a case other than foreclosure in which the minors need not appear we would have agreed with the lower court in setting aside the proceeding. *Cf. Planas* v. *Chambers,* 50 P.R.R. 495.

In the present case we met a series of facts which taken as a whole leave the strong conviction that there could not have been an honest and equitable judicial proceeding, nor a just judgment rendered against the complaint for lack of defense, which not only labelled plaintiff as the guilty wife, notwithstanding the fact that her mental state could have been a meritorious defense and exonerated her from all responsibility but also prejudiced her and her children in their patrimonial rights. The plaintiff's schizophrenia and the complete knowledge that her husband had of her insane state are

of the spouse sued for the acts charged against the latter. To this effect the doctrine establishes that the divorce does not lie on the ground of acts committed by the person while he was disable, (except, of course, when the insanity itself is the cause), especially those grounds which require a specific intention or wilful conduct. See the discussion on the cited Anno. 19 A.L.R.2d 144–180 which follows the England case *White* v. *White,* Prob. 39 (1950). *Rivera* v. *Cruz,* 67 P.R.R. 723; *Willis* v. *Willis,* 274 S.W.2d 621 (Mo. 1954); *Nelson* v. *Nelson,* 154 N.E.2d 653 (Ohio 1958); *Trethewey* v. *Trethewey,* 115 So.2d 712 (Fla. 1959); *Carlson* v. *Carlson,* 32 N.E.2d 365 (Ill. 1941); *McIntosh* v. *McIntosh,* 117 So. 352 (Miss. 1928); *Heim* v. *Heim,* 172 N.E. 451 (Ohio 1930); 1 Nelson on Divorce and Annulment 355–357, 2d ed.

We shall not decide on this occasion, since we do not have before us the divorce case in itself, whether plaintiff herein, in her mental state was totally irresponsible of the acts charged against her, or whether notwithstanding her state, she knew and was capable of understanding the nature of the alleged conduct towards her husband, so that a divorce could have been decreed or denied in the merits, if she would have been able to defend herself. *Cf. White* v. *White, supra.*

facts which are manifest in the record. She was not summoned through the person of a guardian, offering the greatest protection for her defense, because her own husband, upon whom rested the obligation of obtaining the judicial declaration of her incapacity, failed to do so. The court did not comply with the provisions of § § 56 and 57 as to the appointment of a guardian ad litem because the husband never informed the court of the wife's mental state. Although the summons in process could be served on the person of the wife, her husband knew that in the absence of a guardian she could hardly make the pertinent determinations to defend herself in the action. There is the uncontroverted medical conclusion in the record that with the symptoms which the plaintiff showed she was oblivious of reality and could not realize what a summons was and what she had received. And the fact remains that the evidence clearly shows that at the time of the divorce complaint which charged the commission of the cruel treatment and grave injuries the plaintiff was already mentally sick. The latter was not mentioned to show an inaccurate exposition to the court in the very allegations of the complaint as to her conduct and that there was no conjugal property, which has been designated in the doctrine as *intrinsic* fraud which, as we have mentioned before, we shall not decide in this appeal, but to emphasize up to what point there existed a meritorious defense which could have changed the outcome of the action and up to what point, there being such defense, it was necessary to designate a guardian which was not appointed because of the silence kept by the husband, which omission failed to make said proceeding a just and equitable one for her. We would refuse to believe that if the court had been informed in the divorce suit about the wife's insanity, the court would have failed to observe the law and pass to render judgment without the appointment of a guardian, particularly in a proceeding in which the state itself is considered to have a great interest. We would also

refuse to believe that if a guardian had been appointed he would not have raised as a defense plaintiff's irresponsibility as to the acts which constituted the grounds for the action, which defense in accordance with the consensus of the cases might have led the case to a different result.[8]

The authorities leave no room for doubt that a judgment thus rendered should not prevail. In *Rice* v. *Rice*, 125 N.E.2d 787 (Mass. 1955), affirming the annulment of a divorce decree for cruel and abusive treatment rendered against the insane wife when the action was filed, without the husband informing said fact to the court, the Supreme Judicial Court of Massachusetts stated with citation of abundant authorities, that the judge had concluded that the husband knew of the insanity of the wife or that the husband intentionally kept himself from knowing in order to avoid informing the judge of it and that said proceeding was a fraud on the court and justified the vacating of the decree. The act which, if performed by a normal person, would be ground for divorce, does not justify the dissolution of the marriage bond if committed by an insane person and it concluded that by a consensus of American authorities a divorce cannot be granted on the ground of cruel and abusive treatment because of acts done by an insane person. The defense of insanity, which could have been presented by the wife, was meritorious and substantial. If the insanity of the wife had been known by the judge, under the laws of the State, no divorce could have been granted.

*Edison* v. *Edison*, 178 C.A.2d 632 (Cal. 1960), set aside a divorce decree under the wife's allegations that the husband had committed fraud on the court because he kept from the court the fact that she was insane, thus depriving her of the right to be heard and preventing a fair adversary proceeding.

---

[8] The ground for divorce by reason of insanity did not exist in 1922. It was added to § 96 of the Civil Code by Act No. 78 of 1938, and requires the incurable insanity for a period of more than seven years when it seriously prevents the spouses living together spiritually.

The court stated that if the husband had revealed to the court the wife's mental condition, which he knew, adjudication would have been postponed until the question of competency could be determined. To the husband's arguments for justification that he had given this information to the attorney, the court said that said information in the confidential attorney-client relation did not discharge the husband of his duty of disclosure to the court or avoided or minimized the fraud on the court, his wife, and the children of the parties.

In *Saunders* v. *Saunders*, 320 P.2d 131 (Cal. 1958), an action of the wife to set aside a divorce decree on the ground of extrinsic fraud, the judgment of the lower court was reversed when it refused to grant leave to amend the original complaint alleging that at the time of the divorce proceedings she was mentally incompetent and that the husband knew of it; that she was incompetent to handle her affairs and to cooperate with her counsel in her defense in the divorce action; that her counsel did not know she was mentally incompetent; her husband concealed said fact from the court and her counsel, and no general guardian was appointed; that under this situation, in the divorce suit a property settlement agreement was executed, and that but for the said mental incompetency the divorce decree would not have been granted nor the property settlement executed; and that said act by the husband prevented her from having effective advise of counsel and of presenting her case to said court in said action. The court said, based on many authorities, that although the husband in the divorce suit took no step to keep the wife away from court and made no express misrepresentation to the court, he was in a position where he had the positive duty to speak and to tell the truth and that cases involving confidential relationships, such as husband and wife, uphold that unwarranted silence of one who should speak, constitutes an extrinsic fraud or mistake which will undo a judgment obtained thereby. Courts, it was said, frequently set aside judgments rendered against incompetent defendants where it

is probable that injustice has resulted and there exists a well-recognized jurisdiction in equity to relieve incompetent defendants from judgments rendered under circumstances of unfairness. Equity's jurisdiction to interfere with said judgments is based, the court says, upon the absence of a fair adversary trial. The wife's counsel ignored her mental state; the husband knew said fact and of his wife mental incompetency but did not inform both things to the court. This raised sufficient equity in favor of the wife to overthrow the divorce decree whether it be called extrinsic fraud, extrinsic mistake or an exercise of the well-recognized jurisdiction in equity utilized to relieve incompetent defendants from judgments rendered under unjust circumstances.

In *Wilder* v. *Wilder*, 181 S.W.2d 17 (Ark. 1944), a divorce decree obtained by the husband on the ground of three-year separation was set aside because the husband concealed from the court the fact that the wife was insane at the time the divorce decree was granted, the separation not being a voluntary act on her part. The Court said that the divorce had been granted on a nonexisting cause of action which would not have given cause to be granted, had the facts that the husband knew of the mental state of his wife and of her commitment been informed to the court. This, it said, constituted a fraud practiced upon the court in the procurement of the divorce decree.[9]

In *Heine* v. *Witt*, 28 N.W.2d 248 (Wis. 1947), the husband broke the marriage bond with the insane wife presenting her as the plaintiff in the action, for which he provided the services of an attorney. He appeared by attorney but interposed no answer. A stipulation was made as to the division of property. The wife prayed that the judgment be set aside on the ground that she was mentally incompetent, which fact was known to the husband and the attorney provided by him. Concluding that the evidence manifestly showed the insanity

---

[9] *Cf. Rivera* v. *Cruz*, 67 P.R.R. 723.

of the wife, the court said that if the attorney who represented her had informed this fact to the divorce counsel (office created to protect the public interest in such cases) or to the judge, there is no doubt that the judge would have insisted on the testimony of the psychiatrist and the divorce would have been denied. It did not appear from the evidence whether the plaintiff's attorney informed the defendant's attorney of her insanity. Knowing about it, and not having informed either the judge or the divorce counsel it was his duty to inform the attorney of the defendant so that the case should not go by default and that the issue of insanity be raised and litigated. In no other way could he have avoided aiding in perpetrating a fraud upon the court. If the husband's counsel was not informed, plaintiff's counsel participated in a fraud upon the court; and if defendant's counsel was informed he participated in such fraud by not putting the fact of insanity in issue. To the contention of the trial judge that the wife's insanity did not deprive the court of jurisdiction, the court stated that this was besides the point, and that if she was insane and a fraud was perpetrated by not informing the court of said fact, the judgment should have been set aside. It was said that even if the wife may have lucid intervals a husband cannot have advantage of a divorce from her, just because she had a lucid interval at the time the divorce was granted.

In *Taylor* v. *Taylor*, 165 S.E. 414 (Va. 1932), it was likewise held, making a study of the authorities, that a divorce procured under circumstances where a husband concealed from the court that the wife was insane, could be vacated, notwithstanding the husband's remarriage and the lapse of several years. The divorce was granted in 1914, the husband died in 1927 and the action was filed in 1931. It was said when the divorce was annulled that the husband concealed from the court that the defendant was insane and had concealed the fact that her absence from the state was by his agreement. If these facts had been shown, the court would

not have entertained the suit. The husband procured a divorce in a situation where he was entitled to none and not because of error by the court when deciding the issues presented, but because of matters outside the issues of the case which the plaintiff knew and which he, in good faith, should have made known to the court. The defendant could not apprize the court of the facts because she was insane, and her failure to act for so long cannot be held against her because her mental condition prevented an understanding of her rights.

In *Jorgensen* v. *Jorgensen*, 193 P.2d 728 (Cal. 1948), an action by the wife to eliminate from a divorce decree certain provisions relating to the property settlement agreement on the ground that her husband concealed facts, the Supreme Court of California in bank, when discussing the problem, said that equitable relief will be denied where it is sought to relitigate an issue involved in a former proceeding on the ground that allegations or proof of either party were fraudulent or based on mistake, but such relief may be granted if the party seeking it was precluded by fraud or the mistake of the other party from participating in the proceeding or from fully presenting his case. It was said that the policy permitting a party to such relief from a judgment entered in a proceeding in which he was deprived of a fair opportunity to present his case applies when a party's adversary, in violation of a duty arising from a trust or confidential relationship, has concealed from him facts essential to the protection of his rights. The failure to perform the duty to speak or make disclosures which a person has because of a trust or confidential relation, said the Supreme Court of California, citing *Freeman*, is obviously a fraud for which equity may relieve from a judgment thereby obtained, even though the breach of duty occurs during a judicial proceeding and involves false testimony, and this is true whether such fraud be regarded as extrinsic or an exception to the extrinsic fraud rule.

In *Preston* v. *Reed*, 44 A.2d 685 (Me. 1945), a case seeking to reverse or correct a divorce decree granted against the wife on the ground of her insanity, in which she had no guardian and no counsel was appointed, she was not represented at the hearing, and the decree was obtained by fraud upon the court, it was said that the redress of wrong to an individual, and condemnation of fraud upon the court itself, were attributes of justice, and it would be a travesty to hold that there was no remedy. If a plaintiff takes judgment against an insane person without the suggestion of insanity to the court, or notice to guardian, he must do so at his peril. See: *Ammon* v. *Wiebold*, 48 Atl. 950 (N. J. 1901); *Gillespie et al.* v. *Gouly*, 52 Pac. 816 (Cal. 1898); *Cahaley* v. *Cahaley,* 12 N.W.2d 182 (Minn. 1943); *Olivera* v. *Grace*, 122 P.2d 564 (Cal. 1942).

In *Olivera* v. *Grace, supra,* the Supreme Court of California in bank offered an ample discussion of the problem we have before us. It involved an action to set aside judgment rendered against an insane defendant, which reformed the terms of a contract of joint tenancy. The courts, it was said, frequently set aside judgments rendered against incompetent defendant where it is probable that injustice has resulted. Apart from the situation in which the courts have the power to set aside judgments under statutory authority or under their inherent power to correct their own records, there exists a well-recognized jurisdiction in equity which has been utilized to relieve incompetent defendants from judgments taken under circumstances of unfairness and injustice. Equity's jurisdiction to interfere with said judgments is based upon the absence of a fair adversary trial in the action. The ground for the exercise of such jurisdiction is that there has been no fair adversary trial at law. A typical situation, it is said, occurs where the lack of a fair adversary hearing is attributable to matters outside the issues adjudicated therein, which prevented one party from presenting his case to the court, as for example, when there is extrintic fraud. One

who has been prevented by extrinsic factors from presenting his case to the court may bring an independent action in equity to secure relief from the judgment entered against him.[10] See: Freeman, *A Treatise of the Law of Judgments*, Vol. III, 5th ed. § § 1186, 1188, 1189, 1207, 1231–1237; 1 Nelson, Divorce and Annulment, 355; 171 *et seq.* Vol. 3; *Jelm* v. *Jelm*, 98 N.E.2d 401 (Ohio 1951).

Under every competent authority we cannot reach any other conclusion at law but that the divorce decree rendered in default to which the present action refers was void because of extrinsic fraud on the court and on the party when it was rendered. In equity and justice, and in the light of the good standards which should prevail when dispensing justice, a judgment thus obtained should be set aside unless considerations of great weight, also of justice and equity, should not advise so. Under like authority, the facts we have referred to do not render completely void or *ab initio* the divorce decree but merely voidable.

This was initially a personal action by the plaintiff, Carmen Hernández, filed while the defendant Fernando Zapater was living, whose basic effect would have been to re-establish her matrimonial status with the defendant by the annulment of the divorce decree. The proceedings having been interrupted, Fernando Zapater died in 1951. The matrimonial bond which it is alleged still existed between them, having been dissolved by death, the cause of action lost its main

---

[10] At the time that this action was filed, Rule 60 of the Rules of Civil Procedure of 1943 prevailed. In *Roca* v. *Tomson*, 77 P.R.R. 396, a divorce case, . . . we held, based on the interpretation given to § 473 by California, equivalent to § 140 of our Code of Civil Procedure, that under Rule 60 the extrinsic fraud is an adequate ground for a motion to set aside a judgment, although the Rule did not mention it, in said case was within the same suit. Rule 60 provided in its paragraph (*b*) that by a motion, the court, etc. could relieve a party . . . from a judgment . . . and that the motion should be made within reasonable time and in no case after the six months had passed. On the other hand, the same Rule provided that it did not limit the power of a court to consider an action for relief of a party from a judgment, order or proceeding. See § 7, paragraph 2 of the Civil Code.

reason of being. There only remained to dilucidate the material interests involved in the patrimony.

In this final stage of the case there unavoidably arise considerations which are vehemently invoked by the defendants-respondents as it is natural they should do, that the courts, in situations like the present one, have not been able to evade or disregard. It is the remarriage of Fernando Zapater, the home that together with his second wife he constituted for 28 years until he died, and the children born in that second home. Those are situations which the judge must face, in which, in both sides of the controversy there are parties free of guilt; and whether the remedy be granted by annulling or setting aside the divorce, or whether it is denied, one innocent party will be affected. The decision rests mostly on the sound discretion and judgment of the courts, which must be such fair judgment as will afford, upon a true balance between whatever equity and justice assists each one of those innocent parties, the most just solution for all and causing the least damage to any one in particular.

It is well settled in the Anglo-American doctrine that a remarriage, even when there are children, shall not prevent a court, on that fact alone, from setting aside or annulling a former divorce decree if proper. But it is likewise a well-settled doctrine, that the existence of a second marriage, specially with children, should induce the court to act with extreme caution and care in annulling a divorce even in cases of fraud on the court, unless the second spouse is also guilty of the facts or aided in their commission. It is equally accepted that the death of any of the spouses extinguishes the action to annul the divorce unless there are property interests involved.[11] The same public policy that does not sanction that the marriage be dissolved through improper methods, also watches, by the same token of social interest, that the

[11] An extense summary and review of old and modern cases on the foregoing principles appear in L.R.A. 1917 B, 486–492; 157 A.L.R. 46–59; 12 A.L.R.2d 153–173; 22 A.L.R.2d 1321–1327.

innocent parties in a second marriage be not left unprotected, particularly, if a family has been formed and said marriage lasted, before society, over more than a quarter of a century.

There is no showing in the record that the wife in the second marriage of Fernando Zapater was not completely innocent of the facts which occurred. On the other hand, no court could re-establish a marriage that for more ten years by now was anyway dissolved forever. The evidence in record shows, although the trial court did not pass on it, that at the time that plaintiff granted to her husband the power of attorney by which he disposed of the conjugal property, she was already suffering from her mental faculties.

In the light of all the circumstances to be considered and of the equity due to all members of this family, which are the adverse parties, the ends of justice and society will not be best served by annulling now the divorce decree rendered in 1922 insofar as it dissolved the previous matrimonial bond, thereby altering the entire filial status of a family. The divorce decree should be set aside as to the pronouncement that no conjugal property existed.

The judgment rendered in this case dismissing the complaint as to the first cause of action is hereby reversed and another rendered instead with the following pronouncements: (1) setting aside the divorce decree as to the pronouncement of the nonexistence of conjugal property; (2) remanding the case to the trial court: (a) to decide, pursuant to the evidence in record and to the other that might be presented as stipulated by the parties, whether the disposition of the conjugal property made by Fernando Zapater prior to the divorce was valid, among them, the property of 3 cuerdas and 47 hundredths which he later acquired as divorced, and if said conveyances are set aside, to liquidate said conjugal property in conformance with the law; (b) for any other further proceedings not incompatible with this opinion.

Mr. Justice Hernández Matos did not participate herein.